Alice Jean **CHESTER**, Executrix of the Estate of William Chester, Deceased, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Civ. A. No. 74–1089.

United States District Court, W. D. Pennsylvania.

Oct. 20, 1975.

Irving M. Portnoy, Pittsburgh, Pa., for plaintiff.

James A. Villanova, Asst. U. S. Atty., Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, District Judge.

This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674. Plaintiff, Alice Jean Chester, Executrix of the Estate of William Chester, deceased, is a citizen of Pennsylvania and a resident of Pittsburgh. At all times relevant hereto, the defendant, through the Veteran's Administration, operated the Oakland Veteran's Administration Hospital in Pittsburgh (hereinafter called the Hospital).

William Chester died of advanced gastric carcinoma on October 8, 1973 at the age of 49; he is survived by his widow, Alice Jean Chester, aged 50 at the time of trial, and 11 children: Carol Lamb, 27; Kevin 25; Mary Beth, 21; William, 19; James, 19; Janet, 17; Patricia, 15; Michael, 13; Jeane, 12; Margaret, 10; Rachel, 8. The widow and 10 children lived at their home in Pittsburgh at the time of decedent's death. At the time of trial five children were under 18.

Since the decedent was discharged from military service he had been treated by Government Hospitals on various occasions for service connected conditions. In 1946 an infected hypoplastic kidney was removed, and since then he had been afflicted with hypertension.

In 1947 he was advised to have a sympathectomy to relieve the high blood pressure but he refused. Since 1964 he has taken medication for this condition. In December, 1970, he was admitted to the Hospital's Hypertension Clinic as an outpatient and later to the Hospital's Renal Clinic as an outpatient. Until he died he was under the care of physicians employed by the Hospital, except when he underwent surgery in the Presbyterian Hospital and was a patient therein substantially from March 24, to May 4, 1973.

In January, 1971, he reported to the Hospital that he had blurred vision, angina pains in his chest of six or seven months duration, constant bitemporal headaches, dizziness, pain in his eyes and "general tiredness." He reported that his father had died of a heart attack and his mother had died of carcinoma of the esophagus. No diagnosis was made, but he was treated for hypertension on an outpatient basis, generally visiting the hospital monthly. He was obese, weighing 239 pounds. He was a heavy cigarette smoker. Altogether from December, 1970 to March 12, 1973, he visited the Hospital approximately 20 times.

From January, 1971 until about June, 1972, his hypertension seemed to be under control and he worked regularly at his position as a supervisor—investigator for Wackenhut Corporation.

As early as June 12, 1972 he was exhibiting symptoms consistent with carcinoma of the esophagus. From June on he experienced a steady decline in health. He weighed 232 pounds, he had very high cholesterol, he complained of loss of energy, fatigue, decreasing exercise tolerance, suffered pain intermittently under his rib on his left side which radiated into his left arm, his liver was enlarged, and his appearance changed radically. In August his pains were more frequent and severe, he could not swallow well and regurgitated several times a week, he experienced pain on swallowing and pain on eating. His eating habits changed; from being a hearty, fast eater he changed to eating slowly, eating soft foods and drinking liquids to get the food down; he became pale and lost considerable weight.

Mr. Chester complained frequently in July and August to his wife and to the doctors in the hospital about his pains and difficulty in swallowing. His wife, a registered nurse, who was employed by the Hospital, also complained to a doctor in the Hospital about her husband's unrelieved pains and swallowing difficulties.

In view of these urgent complaints of Mr. Chester and his wife disclosing symptoms consistent with cancer of the esophagus, the doctors in the Hospital were negligent, and through them the Government, in not ordering an esophagoscopy, upper gastro-intestinal x-rays, an esophagram, biopsy and a barium swallowing test to rule out a diagnosis of cancer of the esophagus.

Unable to get relief at the Hospital, Mr. Chester, probably in desperation, related his complaints to Dr. Dornenberg, a surgeon in private practice, who was known to the Chester family. Dr. Dornenberg immediately sent him to the Pittsburgh Hospital for upper gastro-intestinal x-rays. The x-rays were taken on November 3, 1972. Dr. Dornenberg read the radiologist's report to Mr. Chester. Upon his next visit to the Hospital on November 27th Mr. Chester reported to Dr. Harbans Singh at the Renal Clinic that the Pittsburgh Hospital x-rays disclosed that he had a hiatus hernia. Actually the x-rays clearly demonstrated an obstruction of the cardioesophageal junction to a degree indicative of carcinoma of the esophagus.

I find that Dr. Singh was mistaken when he stated that Mr. Chester told him he was taking treatments from Dr. Dornenberg for his hiatal hernia, or treatments from any family doctor. Mr. Chester was not treated by Dr. Dornenberg, nor did he consult the radiologist, Dr. Kwang Choi, nor was he treated by any private family doctor.

Dr. Singh was Mr. Chester's physician at the Hospital from November 27th to March 12th, 1973. During this period Dr. Singh was unlicensed to practice medicine in any state in the United States. I find Dr. Singh was negligent on November 27th in failing to communicate with Dr. Dornenberg or Dr. Choi; and in failing to request the Pittsburgh Hospital to forward the x-rays to the Hospital for examination by its gastroenterologist or its radiologist (as was done later by the Presbyterian Hospital in March); and in failing to examine Mr. Chester's complete records and prior charts on file disclosing complaints and symptoms consistent with cancer of the esophagus or other gastric disease, including a 14 day weight loss of seven pounds;[1] and in failing to consult other doctors in the Hospital; and in failing to immediately order an upper G.I. series at the Hospital as did Dr. Dornenberg although the latter did not have any of the prior charts and records, but only Mr. Chester's complaints.

I find that in the light of Mr. Chester's history, his familial history of cancer, his symptoms and urgent complaints, that it was forseeable as early as August and especially in November, 1972, that he might have been afflicted with cancer of the esophagus or stomach, and the failure of the Hospital doctors during that period to administer a barium swallowing test and other esophageal tests was negligence which fell short of the recognized and accepted medical practice in this community. If there was a possibility that Mr. Chester had carcinoma of the esophagus, the Hospital doctors had no right to gamble with his life on the theory that he was suffering only from hypertension.

I find that Mr. Chester's cancer was operable as late as November, 1972 and that his cancerous lesion could have been surgically resected before any metastasis into the stomach had occurred. I find that his chances for survival were greater if the resection had been performed during the period of August through November, 1972. The negligence of the Hospital's doctors, and through them the Government, was the proximate cause of and a substantial factor in producing Mr. Chester's pain, suffering and inconvenience and premature death on October 8, 1973.

The Government did not call a medical expert who was not connected with the Hospital. I find that the testimony of Dr. Davis, the Chief of Staff of the Hospital, with responsibility for the quality of medical care for all Veteran's Administration patients, would naturally be expected to give the benefit of any doubts in connection with treatment and diagnosis to the Hospital and its physicians employed under his direction and supervision.[2]

### DAMAGES

 Although the Hospital personnel made no diagnosis of Mr. Chester's ailments, it is evident and I find that he had long standing hypertension, obesity, high cholesterol, cardio-vascular disease and angina pectoris. He suffered a myocardial infarction on March 24th, and was admitted to the Presbyterian Hospital where the gastro-intestinal x-rays taken at the Pittsburgh Hospital on November 3, 1972 were promptly sent for by the doctors in the Presbyterian Hospital and the cancerous condition discovered and diagnosed. It was too late to surgically resect the cancerous lesion, and a gastrotomy tube was inserted into his stomach to provide sustenance. The hole through the skin of the abdomen gradually enlarged and a colostomy bag became necessary. He was unable to work until his death. He was in con-

1. Thereafter, Mr. Chester's weight loss was precipitous; by January 15, 1973, he had lost 19 pounds.

2. Although the complaint was filed on November 7, 1974 and the answer on January 10, 1975, Dr. Davis first heard of the case when subpoenaed by the Government on September 29, 1975 and his report required by the pretrial order was untimely filed on October 7, 1975.

stant pain and experienced considerable inconvenience.

 In my judgment Mr. Chester did not have the normal life expectancy admitted to be 23.9 years and work life expectancy of 14 years. His health was extremely precarious, afflicted as he was with long standing hypertension, heart disease and esophageal cancer. In estimating life expectancy the factors to be taken into consideration are the decedent's age, the fact that his mother died of esophageal cancer, his maternal grandmother died of cancer of the stomach, and his sister has cancer, his prior state of health, his weight, the nature of his employment, his personal habits, and the fact that the survival rate for persons having esophageal cancer is very low,—about 9%, and most victims die within six to nine months of diagnosis and a surgical operation. *Russell v. City of Wildwood,* 428 F.2d 1176, 1179–1181 (3rd Cir. 1970); *Brodie v. Philadelphia Transportation Comp.,* 415 Pa. 296, 203 A.2d 657, 660 (1964); *Rowles v. Evanuik,* 350 Pa. 64, 38 A.2d 255, 258 (1944); *Di Pietro v. Great Atlantic & Pacific Tea Co.,* 315 Pa. 209, 173 A. 165, 167 (1934); *McCaffrey v. Schwartz,* 285 Pa. 561, 132 A. 810, 814–816 (1926). *Cf. Tabor v. Miller,* 389 F.2d 645, 647 (3rd Cir. 1968).

In view of the foregoing factors if decedent's cancer had been resected during the period from August through November, 1972, I estimate that he would have lived and worked as a supervisor—investigator for Wackenhut Corporation through December, 1976.

I estimate his earning power from March 23, 1973 through December, 1976 at $50,200. Reducing this figure by the cost of his personal maintenance and his estimated earning power from date of trial through December, 1976 to its present worth, I find that the plaintiff executrix is entitled under the Wrongful Death Act to $36,741.10 plus loss of guidance, advice, training, discipline and care sustained by his minor children (five of whom would be under 18 as of December, 1976) in the amount of $7,500; plus funeral expenses of $1,747.-00 or a total amount of $45,988.10.

Under the Survival Act I find the plaintiff executrix is entitled to the pain, suffering and inconvenience decedent endured as the result of the Hospital's negligence in the amount of $7,500 plus medical expenses in the amount of 7,486.86, or a total amount of 14,986.-86.

An appropriate order will be entered.