FALCON v MEMORIAL HOSPITAL

Docket Nos. 86721, 86722. Argued April 4, 1990 (Calendar No. 8).
Decided September 26, 1990. Rehearing denied 437 Mich 1208.

Ruby Falcon, as administratrix of the estate of Nena J. Falcon,
deceased, brought a wrongful death action in the Monroe
Circuit Court against Memorial Hospital, Dr. S. N. Kelso, Jr.,
and Norma Denny, a nurse anesthetist, alleging that the defen-
dants' medical malpractice during childbirth caused the dece-
dent to lose a 37.5 percent opportunity of surviving an amniotic
fluid embolism. The court, Daniel L. Sullivan, J., dismissed the
case against all the parties, finding that the plaintiff had not
made out a prima facie case on the issue of negligence. The
Court of Appeals, MICHAEL J. KELLY, P.J., and SHEPHERD and
C. W. SIMON, JJ., reversed and remanded the case in an unpub-
lished opinion per curiam (Docket No. 83193). The Supreme
Court denied leave to appeal. 428 Mich 884 (1987). On remand,
the court granted summary disposition for the defendants,
finding that the plaintiff had not established that the decedent
would have had more than a fifty percent chance of survival
had a procedure asserted by the plaintiff's expert witness not
been omitted. The Court of Appeals, D. E. HOLBROOK, JR., P.J.,
and SAWYER and J. M. BATZER, JJ., reversed, finding that the
plaintiff was required to establish only that the omitted treat-
ment or procedure had the potential of improving the dece-
dent's recovery or preventing her death and that the probabil-
ity need not be greater than fifty percent (Docket No. 101586).
The defendants appeal.

In an opinion by Justice LEVIN, joined by Justice ARCHER,
and an opinion by Justice BOYLE, joined by Justice CAVANAGH,
the Supreme Court *held:*

Loss of an opportunity to survive is compensable in medical
malpractice actions, in proportion to the extent of the lost
opportunity, even though the opportunity lost was less than
fifty percent and it is not probable that an unfavorable result
would or could have been avoided. The plaintiff must establish

REFERENCES
Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 359, 367.
Medical Malpractice: "loss of chance" causality. 54 ALR4th 10.

that the defendant more probably than not reduced the opportunity of avoiding harm.

Justice LEVIN, joined by Justice ARCHER, stated further that loss of an opportunity for a more favorable result should be compensable.

In a medical malpractice action, a patient generally is not a stranger to the physician, but rather has engaged the physician's services. The physician undertook to perform services for the patient, and the patient undertook to pay for the services. The scope of the undertakings by a physician or hospital to the patient and by the patient to the physician or hospital is not generally a matter of express agreement. There is an understanding, however, that the law enforces. The patient expects a physician to do what is expected of physicians of like training in the community, and the physician expects to be paid regardless of the degree of chance that there will be benefit to the patient.

Patients engage the services of doctors, not only to prevent disease or death, but also to delay death and to defer or ameliorate the suffering associated with disease or death. If the trier of fact were to decide on the basis of expert testimony that the undertaking of a physician included the implementation of tasks and procedures that would enable the physician to provide, in the event of the medical accident, an opportunity for the patient to survive the accident, a failure to implement the procedure would be a breach of the understanding or undertaking. Injury resulting from medical malpractice is not only physical harm, but also includes the loss of opportunity of avoiding physical harm. Physicians should be subject to liability if they fail to measure up to the standard of care.

Recognizing loss of a substantial opportunity of avoiding physical harm as being actionable makes it unnecessary in this case to consider whether the plaintiff's action for medical malpractice can be maintained as an action for wrongful death. The harm resulting from the defendants' asserted malpractice occurred immediately before the decedent's death when the medical accident occurred and when, by reason of the failure to have inserted an intravenous line, it became certain that she would die. At the moment immediately before her death, the decedent had a cause of action for the harm, i.e., the denial of any opportunity of living. Her claim survived her death because all actions and claims survive death. The loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm.

While the decedent's cause of action accrued before her

death, she did not suffer conscious pain and suffering from the failure to implement the omitted procedures between the moment that the medical accident occurred and the time of her death a few minutes later, having been sedated the entire time. The appropriate measure of damages is 37.5 percent times the damages recoverable for a wrongful death.

Justice BOYLE, joined by Justice CAVANAGH, concurring, would recognize a lost opportunity to survive as an injury for which recovery in tort should be allowed, as long as the negligence of the defendant more probably than not caused the loss of opportunity.

Affirmed.

Chief Justice RILEY, joined by Justices BRICKLEY and GRIFFIN, dissenting, stated that an action for wrongful death may not survive a motion for summary disposition where it is uncontested that the plaintiff cannot show that the defendant's negligence caused the decedent's death and will produce evidence only that the decedent would have had an increased chance of survival if the defendant, as in this case, had not negligently failed to insert an intravenous catheter before or immediately after administering saddle block anaesthesia. Where the plaintiff cannot show that the defendant's omission was probably a cause of the death, the degree of certitude justifying the imposition of liability is lacking. The recognition of mere chance as a recoverable item of loss fundamentally contradicts the essential notion of causation. By definition, the lost chance of survival theory would compensate the plaintiff for a mere possibility that the defendant's omission caused the death.

If a defendant's acts did not actually cause the plaintiff's injury there is no rational justification for requiring the defendant to bear the cost of the plaintiff's damages. It is the plaintiff's burden to show a causal connection between negligence and injury. A case cannot go to a jury supported merely by sheer speculation that something might have been a cause or that there was a possibility that something was the cause. There must be some degree of certainty regarding causation before a jury may determine as fact that a medical defendant did cause the plaintiff's injury and thus must compensate the plaintiff. To dispense with this requirement is to abandon the truth-seeking function of the law. Inherent in the concept of causation are a degree of certitude and the notion of foreseeability. In this case, there was a total absence of such evidence.

178 Mich App 17; 443 NW2d 431 (1989) affirmed.

Negligence — Medical Malpractice — Lost Opportunity.

Loss of an opportunity to survive is compensable in medical malpractice actions, in proportion to the extent of the lost opportunity, even though the opportunity lost was less than fifty percent and it is not probable that an unfavorable result would or could have been avoided; the plaintiff must establish that the defendant more probably than not reduced the opportunity of avoiding harm.

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Lee R. Franklin*) for the plaintiff.

*Plunkett & Cooney, P.C.* (by *Robert G. Kamenec*), for defendant Memorial Hospital.

*Weipert & Weipert* (by *Michael A. Weipert*) for defendant Kelso.

Amici Curiae:

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Barbara Hughes Erad* and *Robert W. Powell*) for the Michigan Defense Trial Counsel.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Susan Healy Zitterman*), for the Michigan Hospital Association.

*Schureman, Frakes, Glass & Wulfmeier* (by *Priscilla L. Schwarze*) for the Michigan Society of Hospital Risk Management.

*Mark Granzotto, Monica Linkner,* and *Charles P. Burbach* for the Michigan Trial Lawyers Association.

Levin, J. (*to affirm*). The deposition testimony of

plaintiff Ruby Falcon's[1] expert witness tended to show that had the defendant physician, S. N. Kelso, Jr., followed the procedures the expert witness claims should have been followed, the patient, Nena J. Falcon, would have had a 37.5 percent opportunity[2] of surviving the medical accident that was a cause of her death.

The trial court dismissed the complaint[3] because Falcon's evidence did not show that Nena Falcon probably—defined as more than fifty percent— would have survived if the procedure had not been omitted. The Court of Appeals reversed, stating that Falcon need only "establish that the omitted treatment or procedure had the potential for improving the patient's recovery or preventing the patient's death." *Falcon v Memorial Hosp,* 178 Mich App 17, 26-27; 443 NW2d 431 (1989). The Court added that "while a plaintiff must show

---

[1] The plaintiff is Ruby Falcon, administratrix of the estate of her granddaughter, Nena Falcon.

[2] While "chance" and "opportunity" can be used interchangeably, "chance" includes "the absence of any cause of events that can be predicted, understood, or controlled," *Random House Dictionary of the English Language,* 2d ed, unabridged, p 344, and "opportunity" includes "a situation or condition favorable for attainment of a goal." *Id.,* 1359.

[3] At the trial in 1985, defendants moved for and were granted a directed verdict. The court ruled that Falcon's experts were not familiar with the standard of care in Monroe, Michigan, the situs of the defendant hospital.

It was contended on Falcon's appeal that without regard to whether the circuit court ruled correctly on the qualifications of Falcon's medical experts, the court properly directed a verdict because Falcon had failed to present adequate evidence of causation.

The Court of Appeals reversed on the issue of the qualification of Falcon's experts, declined to reach the causation issue, and remanded the case for trial. *Falcon v Memorial Hosp,* unpublished opinion per curiam of the Court of Appeals, decided August 12, 1986 (Docket No. 83193). Leave to appeal in this Court was denied. 428 Mich 884 (1987).

On remand, a motion for summary judgment was filed, in which it was again argued that Falcon would be unable to provide sufficient proof of causation to raise a question for the jury. The trial court granted defendants' motion. The Court of Appeals reversed. *Falcon v Memorial Hosp,* 178 Mich App 17; 443 NW2d 431 (1989).

some probability that the treatment would be successful, that probability need not be greater than fifty percent."[4] We affirm.

I

Plaintiffs claiming medical malpractice ordinarily contend that the act or omission said to have constituted medical malpractice caused physical harm to the patient. Falcon so contends in the instant case, claiming that although Nena Falcon would have had only a 37.5 percent opportunity of surviving the medical accident that was a cause of her death had the defendant physician followed the procedures the expert claims should have been followed, and hence less than a fifty-one percent

---

[4] The Court of Appeals looked to this Court's decisions in *Rogers v Kee,* 171 Mich 551, 561-562; 137 NW 260 (1912), and *Harvey v Silber,* 300 Mich 510, 520; 2 NW2d 483 (1942), and concluded that a plaintiff need only establish that there was some probability that the omitted treatment would have been successful.

In *Rogers,* this Court said that a patient "calling a physician, is entitled to approved methods of treatment from which experience of the profession indicates beneficial results are probable and to be anticipated; and, if not an entire recovery, a better ultimate condition than if left to chance. . . . We think such testimony presents an issue of fact for the jury—on probability, it is true. The issues of sickness and healing, life and death, are too uncertain to be otherwise forecast, but negligence which deprives a man of such probability is more than *injuria sine damno." Id.,* pp 561-562.

In *Harvey,* the administrator of the estate of Garfield Harvey, deceased, brought a malpractice action against the defendants for negligent diagnosis of the location of a bullet. Expert testimony was to the effect there was a fairly good probability that an operation would have saved the patient's life. This Court said: "There is testimony in the record that there was a probability that an operation would have saved Harvey's life. Therefore the negligent diagnosis could be said to have been the proximate cause of the death." *Id.,* p 520.

In this connection, it is noteworthy that the standard civil jury instructions do not define "probable": "When I use the words 'proximate cause' I mean first, that the negligent conduct must have been a cause of plaintiff's injury, and second, that the plaintiff's injury must have been a natural and probable result of the negligent conduct." SJI2d 15.01.

opportunity of surviving, the defendants neverthe-less caused Nena Falcon's death.

The defendants contend that because the proofs at a trial of Falcon's claim would not show that it was probable, measured as more than fifty percent, that Nena Falcon would have avoided physical harm had the procedure not been omitted, Falcon cannot show that the asserted negligence of defen-dants caused her physical harm. They also contend that Falcon cannot maintain an action for wrong-ful death because such an action can only be maintained where the plaintiff can establish that the act or omission caused death, and, again, Falcon's proofs will fall short because they will show only that there would have been a 37.5 percent opportunity of avoiding death and not a more than fifty percent opportunity had the pro-cedure not been omitted.

II

Some courts disallow recovery for lost opportu-nity unless the plaintiff can establish that the patient would not have suffered the physical harm but for the defendant's negligence, or, at least, that it is more probable, measured as more than fifty percent,[5] that, but for such negligence, the patient would not have suffered the physical harm.[6]

---

[5] It [the probable cause standard] puts a premium on each party's search for the willing witness. Human nature being what it is, and the difference between scientific and legal tests for "probability" often creating confusion, for every expert witness who evaluates the lost chance at 49% there is another who estimates it at closer to 51%. [*Thompson v Sun City Community Hosp, Inc,* 141 Ariz 597, 607; 688 P2d 605 (1984).]

[6] In *Cooper v Sisters of Charity of Cincinnati,* 27 Ohio St 2d 242, 253; 272 NE2d 97 (1971), the court concluded that testimony that survival was "[m]aybe . . . around fifty percent" does not provide a

Under the more probable, measured as more than fifty percent, approach to causation, a plaintiff who establishes that the patient would have had more than a fifty percent opportunity of not suffering physical harm had the defendant not acted negligently, recovers one hundred percent of the damages. The better than even opportunity is compensated as if it were a certainty, although the

basis for finding probability. In a frequently quoted passage, the court explained:

> Lesser standards of proof are understandably attractive in malpractice cases where physical well being, and life itself, are the subject of litigation. The strong intuitive sense of humanity tends to emotionally direct us toward a conclusion that in an action for wrongful death an injured person should be compensated for the loss of any chance for survival, regardless of its remoteness. However, we have trepidations that such a rule would be so loose that it would produce more injustice than justice. Even though there exists authority for a rule allowing recovery based upon proof of causation by evidence not meeting the standard of probability, we are not persuaded by their logic. [*Id.*, pp 251-252.]

Similarly see *Gooding v Univ Hosp Bldg, Inc,* 445 So 2d 1015 (Fla, 1984) (a plaintiff must show that injury more likely than not resulted from the defendant's conduct); *Beisel v Lazenby,* 444 So 2d 953 (Fla, 1984) (in medical malpractice actions it must be shown that the negligence more likely than not caused the damages); *Hanselmann v McCardle,* 275 SC 46; 267 SE2d 531 (1980) (a plaintiff must show that but for the defendant's error, death would have been averted); *Cornfeldt v Tongen,* 295 NW2d 638 (Minn, 1980) (a plaintiff must show that it was more probable than not that death resulted from the doctor's negligence); *Rewis v United States,* 503 F2d 1202 (CA 5, 1974) (a plaintiff must prove that if the doctor had done what proper medical practice required, it is more likely than not that the child would have been saved); *Alfonso v Lund,* 783 F2d 958 (CA 10, 1986) (the proof that the injury was caused by the negligence of the defendant must show probabilities); *Morgenroth v Pacific Medical Center, Inc,* 54 Cal App 3d 521; 126 Cal Rptr 681 (1976) (probability is the standard for proximate cause); *Curry v Summer,* 136 Ill App 3d 468; 483 NE2d 711 (1985) (a plaintiff must show that the decedent would have had a better than even chance of survival); *Tappan v Florida Medical Center, Inc,* 488 So 2d 630 (Fla App, 1986) (a plaintiff must prove that with proper diagnosis and treatment it was more likely than not that the decedent would have lived); *Anthony v Hosp Service Dist No 1,* 477 So 2d 1180 (La App, 1985) (expert testimony is required on whether the person more probably than not would have survived had proper diagnosis or treatment been given).

patient's chances of a better result are significantly less than one hundred percent.[7]

To say that a patient would have had a ninety-nine percent opportunity of survival if given proper treatment, does not mean that the physician's negligence was the cause in fact if the patient would have been among the unfortunate one percent who would have died. A physician's carelessness may, similarly, be the actual cause of physical harm although the patient had only a one percent opportunity of surviving even with flawless medical attention.[8]

All this is simply to say that the more probable than not standard, as well as other standards of causation, are analytic devices—tools to be used in making causation judgments. They do not and cannot yield ultimate truth. Absolute certainty in matters of causation is a rarity.[9]

III

Other courts have permitted recovery for physi-

[7] The more probable than not approach thus tends to over compensate particular plaintiffs. Professor McCormick stated:

> Should the courts insist, in claims for loss of a single specific advantage, upon a showing that the chances were substantially better than even and upon giving all or nothing? To adopt this attitude seems to result in oscillation between overlavishness and niggardliness. [McCormick, Damages, § 31, p 119.]

[8] Under the present [more likely than not] standard of probability applied in all negligence cases in Oklahoma, an expert must speak the "magic words," i.e., that the defendant's conduct more probably than not caused the injury, to ensure that a verdict will not be directed for the defendant. [*McKellips v St Francis Hosp, Inc,* 741 P2d 467, 474 (Okla, 1987).]

[9] However, although we may often forget it, it is hard to quarrel with one of the basic teachings of decision theory: that absolute certainty about past events is no more realizable than absolute certainty about the future. [Kaplan, *Decision theory and the factfinding process,* 20 Stan L R 1065, 1071 (1968).]

cal harm on a showing that the lost opportunity was a substantial, albeit fifty percent or less, factor in producing the harm:

An evolving trend has developed to relax the standard for sufficiency of proof of causation ordinarily required of a plaintiff to provide a basis upon which the jury may consider causation in the "lost chance of survival" cases. [*McKellips v St Francis Hosp, Inc,* 741 P2d 467, 471 (Okla, 1987).][10]

---

[10] Courts have come to recognize that the difficulties of identifying, defining, and proving injury in certain types of medical malpractice cases justifies the application of a standard of causation that is more flexible than that used in conventional tort claims. [*Evers v Dollinger,* 95 NJ 399, 413; 471 A2d 405 (1984).]

In *Bell v United States,* 854 F2d 881, 890 (CA 6, 1988), the United States Court of Appeals for the Sixth Circuit held that the district court erred in entering judgment for the defendant on the basis that the patient did not have a greater than fifty percent chance of surviving when the duty of care was breached. The court also concluded that the district court incorrectly found Bell's chances of survival to be less than fifty percent.

The court said that this Court's decisions "illustrate that the Michigan Supreme Court long ago rejected the notion that a plaintiff must prove with mathematical certainty that had a physician diagnosed and treated a medical condition within the time period that a doctor exercising a reasonable standard of care would have done so, the probability that the patient would have recovered was better than 50%." *Bell, supra,* p 889. The court continued: "Rather, under Michigan law, a 'reasonable probability' is proven if a finder of fact legally could conclude from the evidence presented that the patient had, in the words of the expert witness in *Harvey,* a 'fairly good' chance of surviving the operation. Although we acknowledge the imprecision which nearly always is the necessary companion of any legal standard that rejects quantitative analysis, Michigan law leaves no doubt that it has rejected such analysis in favor of a qualitative one." *Id.* The court concluded:

All Michigan requires is proof that the deceased had a "reasonable probability" of recovery if the medical condition had been discovered and treated within the appropriate time. [*Id.,* p 883.]

The Court defined a "reasonable probability" as a "fairly good" chance.

Some courts have held that the plaintiff need only show that the defendant's conduct was a substantial factor in producing the physical harm.[11] Other courts allow recovery for loss of a fifty percent or less opportunity of achieving a better result without clearly articulating a standard of causation.[12] A number of courts have so held on the basis of language in the Restatement Torts, 2d.[13]

IV

Nena Falcon, a nineteen-year-old woman, gave birth to a healthy baby, Justice Eugene Falcon, in the early morning hours of March 21, 1973. Moments after delivery, Nena Falcon coughed, gagged, convulsed, became cyanotic, and suffered a complete respiratory and cardiac collapse. At-

---

[11] *Hamil v Bashline,* 481 Pa 256; 392 A2d 1280 (1978); *Scafidi v Seiler,* 25 NJ Super 576; 543 A2d 95 (1988); *Chester v United States,* 403 F Supp 458 (WD Pa, 1975); *Snead v United States,* 595 F Supp 658 (D DC, 1984); *Hastings v Baton Rouge General Hosp,* 498 So 2d 713 (La, 1986); *Thornton v CAMC,* 305 SE2d 316 (W Va, 1983); *Jones v Montefiore Hosp,* 494 Pa 410; 431 A2d 920 (1981); *Roberson v Counselman,* 235 Kan 1006; 686 P2d 149 (1984); *Northern Trust Co v Louis A Weiss Memorial Hosp,* 143 Ill App 3d 479; 493 NE2d 6 (1986).

[12] *Kallenberg v Beth Israel Hosp,* 45 AD2d 177; 357 NYS2d 508 (1974), aff'd 37 NY2d 719; 374 NYS2d 615; 337 NE2d 128 (1975) (the patient had a twenty to forty percent opportunity of survival with proper treatment); *Richmond Co Hosp Authority v Dickerson,* 182 Ga App 601; 356 SE2d 548 (1987) (the patient had a less than fifty percent opportunity of survival); *Morales v United States,* 642 F Supp 269 (D PR, 1986) (survival was a possibility). In *Cloys v Turbin,* 608 SW2d 697, 700 (Tex Civ App, 1980), the court said that a plaintiff must establish a "reasonably close causal connection between the defending party's conduct and the resulting injury to the complaining party."

[13] One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm . . . . [2 Restatement Torts, 2d, § 323, p 135.]

tempts to revive her were unsuccessful.[14] She was pronounced dead soon thereafter.

The autopsy report indicated that amniotic fluid embolism,[15] an unpreventable complication that occurs in approximately one out of ten or twenty thousand births, was the cause of death. The survival rate of amniotic fluid embolism is, according to Falcon's expert witness, 37.5 percent if an intravenous line is connected to the patient before the onset of the embolism. In this case, an intravenous line had not been established.[16]

Falcon's theory is that had a physician or nurse anesthetist inserted an intravenous line before administering the spinal anesthetic to assist the physician in dealing with any of several complications, the intravenous line could have been used to

[14] Dr. Kelso, the physician in attendance at the birth, testified that he attempted cardiopulmonary resuscitation. He also testified that a nurse attempted to insert an intravenous line into Falcon after she began to convulse, but could not do so because Falcon's veins had collapsed and were apparently blocked. He added that another physician, Dr. Burroughs, attempted a "cut down," that is, he tried to cut directly into Falcon's vein in order to administer sodium bicarbonate. The "cut down" was unsuccessful. Dr. Burroughs could not inject any medication into Falcon's circulatory system because at that point her circulation had ceased.

[15] An amniotic fluid embolism occurs when the amniotic fluid infuses into the mother's circulatory system, most often through a rent in the uterus or through the mother's pelvic veins. The amniotic fluid is not clear. It may contain undissolved matter such as fetal skin cells, lanugo, mucus, or meconium (excrement from the fetus' intestinal tract). The debris-filled fluid is taken up into the mother's circulatory system, pumped through her heart and into her lungs where the embolus lodges, causing injury, and often, death. Amniotic fluid embolism may be diagnosed in an autopsy by the presence of amniotic debris in the body's lungs.

[16] The plaintiff's expert testified that the 37.5 percent survival rate is computed as follows: fifty percent of the women who suffer an amniotic fluid embolism will die within an hour. Of the remaining fifty percent, approximately half of those will develop a bleeding or coagulation problem called "DIC." Of the twenty-five percent who develop DIC, half will survive. Therefore, the survival rate of women who suffer amniotic fluid embolism is 37.5 percent.

Dr. Kelso testified that the survival rate of amniotic fluid embolism is zero percent. He raised the survival figure to five percent to account for cases where an exact diagnosis cannot be found.

infuse life-saving fluids into Nena Falcon's circulatory system, providing her a 37.5 percent opportunity of surviving. By not inserting the intravenous line, the physician deprived her of a 37.5 percent opportunity of surviving the embolism.

V

The question whether a defendant caused an event is not readily answered,[17] and is especially perplexing in circumstances such as those present in the instant case where the defendant's failure to act is largely responsible for the uncertainty regarding causation.[18]

Had the defendants in the instant case inserted an intravenous line, one of two things would have happened, Nena Falcon would have lived, or she would have died.[19] There would be no uncertainty

[17] There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion. [Prosser & Keeton, Torts (5th ed), § 41, p 263.]

[18] In *Evers v Dollinger,* n 10 *supra,* p 415, a physician was charged with medical malpractice for failing to diagnose breast cancer. The Supreme Court of New Jersey observed:

A conspicuous feature of *Hamil* [n 11 *supra*], and of the case before us, is that defendant was charged with having failed in a duty to protect against harm from another source; hence the fact-finder must consider not only what *did* occur but also what *might have* occurred . . . . [Emphasis in original.]

See also Malone, *Ruminations on cause-in-fact,* 9 Stan L R 60, 61 (1956); *Hake v Manchester Twp,* 98 NJ 302, 312-313; 486 A2d 836 (1985).

[19] In this case the alternative forces of causation at play were unusually few. If Nena Falcon's physician had connected the intravenous line it would have become clear within a short period of time whether she would have lived or died. The physician's failure to act is the primary source of the uncertainty regarding causation.

In loss of opportunity cases where the negligence charged is a physician's failure to diagnose malignancy, there are generally more variables in the causation calculus. Where a health care provider

whether the omissions of the defendants caused her death.[20] Falcon's destiny would have been de-

failed to diagnose cancer, the delay allows a tumor to grow or the cancer to metastasize. Treatment programs and operations may ensue. In the end, the causal relation between the delay in diagnosis and the patient's death may be clouded by intervening causal factors. See *Jeanes v Milner,* 428 F2d 598 (CA 8, 1970); *O'Brien v Stover,* 443 F2d 1013 (CA 8, 1971); *Mays v United States,* 608 F Supp 1476 (D Colo, 1985); *Snead,* n 11 *supra; James v United States,* 483 F Supp 581 (ND Cal, 1980); *DeBurkarte v Louvar,* 393 NW2d 131 (Iowa, 1986); *Truan v Smith,* 578 SW2d 73 (Tenn, 1979); *Herskovits v Group Health Cooperative of Puget Sound,* 99 Wash 2d 609; 664 P2d 474 (1983); *Evers,* n 10 *supra; Jones v Montefiore Hosp,* n 11 *supra; Morrison v Stallworth,* 73 NC App 196; 326 SE2d 387 (1985).

[20] Courts have seen the need for flexibility in addressing causation where a defendant fails to rescue a seaman or to provide safety devices. See 4 Harper, James & Gray, Torts (2d ed), § 20.2, pp 89-113; Wolfstone & Wolfstone, *Recovery of damages for the loss of a chance,* 1982 Medical Trial Technique Q 121, 130-132; Malone, n 18 *supra,* pp 75-79.

The California Supreme Court observed:

[T]he evidentiary void in the instant action results primarily from defendants' failure to provide a lifeguard to observe occurrences within the pool area. . . . The absence of such a lifeguard in the instant case thus not only stripped decedents of a significant degree of protection to which they were entitled, but also deprived the present plaintiffs of a means of definitively establishing the facts leading to the drownings. [*Haft v Lone Palm Hotel,* 3 Cal 3d 756, 771; 91 Cal Rptr 745; 478 P2d 465 (1970).]

In *Gardner v Nat'l Bulk Carriers, Inc,* 310 F2d 284, 287 (CA 4, 1962), a seaman was not reported missing until more than five hours after he was last seen. The defendant urged that causation had not been established because there was no evidence that the man was alive and could have been saved. The court said that the consequence of the master's default "obliterated all possibility of evidence to prove whether a search, if undertaken, would have succeeded or failed."

"What, then, the culpable actor has done by his initial negligent act is, first, to have set in motion a dangerous force which embraces the injured person within the scope of its probable mischief; and next, in conjunction with circumstances which he must be held to contemplate, to have made more difficult if not impossible the means of proving the possible damaging results of his own act or the similar results of the act of another. He has violated not only the victim's substantive right to security, but he has also culpably impaired the latter's remedial right of establishing liability. By confusing his act

cided by fate and not possibly by her health care providers. The United States Court of Appeals for the Fourth Circuit, observed:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly. *Harvey v Silber,* 300 Mich 510; 2 NW2d 483 (1942).[21] [*Hicks v United States,* 368 F2d 626, 632 (CA 4, 1966).[22] Emphasis in original.]

with environmental conditions, he has, in effect, destroyed the victim's power of proof.

"The legal consequence of that is, I should say, that the onus is then shifted to the wrongdoer to exculpate himself . . . ." *Cook v Lewis,* [1951] Can Sup Ct 830, 832-33 [1952]; 1 Dom L Rep 1, 3-4 (1951). [*Gardner, supra,* p 287, n 4.]

Professor King similarly explained:

Destruction of a chance should also be compensated for reasons of fairness. But for the defendant's tortious conduct, it would not have been necessary to grapple with the imponderables of chance. Fate would have run its course. A defendant's tort not only destroys a "raffle ticket," in so doing it destroys any chance of ever knowing how that ticket would have fared in the drawing. [King, *Causation, valuation, and chance in personal injury torts involving preexisting conditions and future consequences,* 90 Yale L J 1353, 1378 (1981). See also *Whitfield v Whittaker Memorial Hosp,* 210 Va 176; 169 SE2d 563 (1969), *Hake v Manchester,* n 18 *supra,* pp 310-311, and Wolfstone & Wolfstone, *supra,* p 133.]

[21] See n 4.
[22] In *Stewart v Rudner,* 349 Mich 459, 473-474; 84 NW2d 816 (1957),

VI

In an ordinary tort action seeking recovery for physical harm, the defendant is a stranger to the plaintiff and the duty imposed by operation of law is imposed independently of any undertaking by the defendant. In an action claiming medical malpractice, however, the patient generally is not a stranger to the defendant. Generally, the patient engaged the services of the defendant physician. The physician undertook to perform services for the patient, and the patient undertook to pay or provide payment for the services.

The scope of the undertakings by a physician or hospital to the patient and by the patient to the physician or hospital is not generally a matter of express agreement. There is, however, an understanding that the law enforces in the absence of express agreement. The patient expects a physician to do that which is expected of physicians of like training in the community, and the physician expects the patient to pay or provide payment for the services, whether the likelihood of there in fact being any benefit to the patient is only one through fifty percent or is greater than fifty percent.

The defendants assert, in effect, that the scope of their undertaking did not include acts or omissions likely to benefit the patient only to the extent of

this Court, addressing the question whether a doctor's failure to perform a cesarean section on the plaintiff in any way caused the plaintiff to lose her baby, said:

They [the jury] would be justified in finding, on these facts, that if plaintiff had been sent to surgery, instead of back home, on the morning of September 4th (at the latest) that her baby would have been delivered alive. There is, of course, no absolute certainty thereof. The knife might have slipped, or the child might have died at any instant because of forces beyond our control, beyond, possibly, even our comprehension.

one through fifty percent—or at least they should not be subject to liability for acts or omissions likely to have caused harm to the extent only of one through fifty percent. They contend that they should be subject to liability only for acts or omissions likely, to the extent of more than fifty percent, to have caused physical harm to the patient:

> The reasoning of the district court herein (which is similar to the extreme position taken in *Cooper v Sisters*),[23] in essence, declares open season on critically ill or injured persons as care providers would be free of liability for even the grossest malpractice if the patient had only a fifty-fifty chance of surviving the disease or injury even with proper treatment. [*Roberson v Counselman,* 235 Kan 1006, 1021; 686 P2d 149 (1984).]

Patients engage the services of doctors, not only to prevent disease or death, but also to delay death and to defer or ameliorate the suffering associated with disease or death. If the trier of fact were to decide, on the basis of expert testimony, that the undertaking of the defendant physician included the implementation of tasks and procedures that, in the case of Nena Falcon, would have enabled the physician and other medically trained persons, who were present at the time of delivery, to provide her, in the event of the medical accident that occurred, an opportunity to survive the accident, a failure to do so was a breach of the understanding or undertaking.[24]

[23] See n 6.

[24] A parent was permitted to maintain an action against a hospital and physicians for alleged enhancement of injury to her son resulting from the transfer of her son to a county hospital for surgery in *Thompson v Sun City Community Hosp,* n 5 *supra,* p 608. The court held:

Nena Falcon, if the testimony of Falcon's expert witness is credited, would have had a 37.5 percent opportunity of surviving had the defendants implemented the procedures Falcon's expert asserts should have been implemented. In reducing Nena Falcon's opportunity of living by failing to insert an intravenous line, her physician caused her harm, although it cannot be said, more probably than not, that he caused her death. A 37.5 percent opportunity of living is hardly the kind of opportunity that any of us would willingly allow our health care providers to ignore. If, as Falcon's expert asserts, the implementation of such procedures was part of the understanding or undertaking, the failure to have implemented the procedures was a breach of the understanding or undertaking. The physician is, and should be, subject to liability for such breach, although Nena Falcon was likely, measured as more than fifty

that because the protection of the chance interest was within the range of the duty breached by defendant and *the harm which followed was the type from which the defendant was to have protected the plaintiff,* the jury may be allowed to consider the increase in the chance of harm on the issue of causation. If the jury finds that defendant's failure to exercise reasonable care *increased the risk of the harm he undertook to prevent,* it may from this fact find a "probability" that defendant's negligence was the cause of the damage. [Emphasis added.]

In so holding, the court observed:

We must remember further, that we are dealing with the *limited class of cases in which defendant undertook to protect plaintiff from a particular harm and negligently interrupted the chain of events,* thus increasing the risk of that harm. Defendant's negligent act or omission made it impossible to find with certainty what would have happened and thus forced the court to look at the proverbial crystal ball in order to decide what might have been. Such determinations, of course, have traditionally been the province of the jury rather than the judge. [*Id.* Emphasis added.]

percent, to die as soon as the medical accident occurred and the negligence of the physician eliminated a less than fifty percent opportunity of surviving.

We thus see the injury resulting from medical malpractice as not only, or necessarily, physical harm, but also as including the loss of opportunity of avoiding physical harm. A patient goes to a physician precisely to improve his opportunities of avoiding, ameliorating, or reducing physical harm and pain and suffering.

Women gave birth to children long before there were physicians or hospitals or even midwives. A woman who engages the services of a physician and enters a hospital to have a child does so to reduce pain and suffering and to increase the likelihood of her surviving and the child surviving childbirth in a good state of health even though the likelihood of the woman and child not surviving in good health without such services is far less than fifty percent. That is why women go to physicians. That is what physicians undertake to do. That is what they are paid for. They are, and should be, subject to liability if they fail to measure up to the standard of care.

## VII

A number of courts have recognized, as we would, loss of an opportunity for a more favorable result, as distinguished from the unfavorable result, as compensable in medical malpractice actions.[25] Under this approach, damages are recoverable for the loss of opportunity although the opportunity lost was less than even, and thus it is

[25] See Prosser & Keeton, n 17 *supra,* § 41, p 272; Wolfstone & Wolfstone, n 20 *supra,* pp 129-130.

not more probable than not that the unfavorable result would or could have been avoided.[26]

Under this approach, the plaintiff must establish more-probable-than-not causation.[27] He must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm.

In *Aasheim v Humberger,* 215 Mont 127, 133; 695 P2d 824 (1985), the plaintiff commenced an action against Dr. Humberger alleging that his failure to order diagnostic films of her knee area, resulted in her losing an opportunity for less radical surgery and of preserving her natural knee. The Supreme Court of Montana treated the reduction in the opportunity of avoiding physical harm as actionable in recognition that patients claiming medical malpractice are generally in-

---

[26] Professor King explains:

[C]onsider the case in which a doctor negligently fails to diagnose a patient's cancerous condition until it has become inoperable. Assume further that even with a timely diagnosis the patient would have had only a 30% chance of recovering from the disease and surviving over the long term. There are two ways of handling such a case. Under the traditional approach, this loss of a not-better-than-even chance of recovering from the cancer would not be compensable because it did not appear more likely [than] not that the patient would have survived with proper care. Recoverable damages, if any, would depend on the extent to which it appeared that cancer killed the patient sooner than it would have with timely diagnosis and treatment, and on the extent to which the delay in diagnosis aggravated the patient's condition, such as by causing additional pain. A more rational approach, however, would allow recovery for the loss of the chance of cure even though the chance was not better than even. The probability of long-term survival would be reflected in the amount of damages awarded for the loss of the chance. While the plaintiff here could not prove by a preponderance of the evidence that he was denied a cure by the defendant's negligence, he could show by a preponderance that he was deprived of a 30% chance of a cure. [King, n 20 *supra,* pp 1363-1364.]

[27] See by analogy, King, n 20 *supra,* pp 1378-1380, discussing cases recognizing loss of chance to win contests as a distinct injury.

jured or diseased at the time of the alleged malpractice:

> We feel that including "loss of chance" within causality recognizes the realities inherent in medical negligence litigation. People who seek medical treatment are diseased or injured. Failure to diagnose or properly treat denies the opportunity to recover. Including this lost opportunity within the causality embrace gives recognition to a real loss consequence of medical failure.
>
> The trier of fact should determine whether defendant's negligence was a substantial factor in reducing plaintiff's chances of obtaining a better result.

In *DeBurkarte v Louvar*, 393 NW2d 131, 135 (Iowa, 1986), the Supreme Court of Iowa explained the difference between viewing the injury as a loss of life and viewing it as a loss of opportunity to survive an illness:

> We recognize that the plaintiff's injury may be viewed as a shortening of her life, in which case we would agree with the defendant that the plaintiffs did not produce substantial evidence on causation: there was no evidence the plaintiff's cancer probably spread after September, 1981, preventing her from being cured. [Citation omitted.] On the other hand, as the Restatement [§ 323(a)][28] indicates, her injury may also be viewed as a lost chance to survive the cancer. The jury could then find from the evidence that the defendant's failure to diagnose and treat the cancer probably caused a substantial reduction in the plaintiff's chance to survive it.[29]

The court concluded: "We believe the better ap-

[28] See n 13.

[29] Plaintiff's expert witnesses "opined that within a reasonable degree of medical certainty the plaintiff's chances of surviving ten years would have been at least fifty and as high as eighty percent if the lump had been removed in September, 1981." *Id.*

proach[30] is to allow recovery, but *only* for the lost chance of survival." *Id.*, p 136. (Emphasis in original.)

The Supreme Court of Washington permitted the personal representative of the patient to maintain an action where there was expert testimony of a fourteen percentage point reduction—from thirty-nine percent to twenty-five percent—in the patient's opportunity for survival, which was claimed to have resulted from a delay in diagnosis of lung cancer. *Herskovits v Group Health Cooperative of Puget Sound,* 99 Wash 2d 609; 664 P2d 474 (1983). The majority, in two separate opinions, agreed, that recovery for "[c]ausing reduction of the opportunity to recover (loss of chance) by one's negligence, however, does not necessitate a total recovery against the negligent party for all damages caused by the victim's death."[31]

In a concurring opinion in *Herskovits,* in which four of six judges comprising the majority joined, the loss of opportunity case law was reviewed and the following conclusions were stated:

---

[30] The court said that "most courts recognize the action for lost chance of survival and medical malpractice." *DeBurkarte,* n 19 *supra,* p 136. The court added:

> In nine of the cases allowing recovery there was a not-better-than-even chance of survival *and a lack of expert testimony* the defendant's negligence *probably* prevented recovery. [*Id.,* pp 136-137. Emphasis in original.]

The court noted that in three of the cases (*O'Brien,* n 19 *supra, James,* n 19 *supra,* and *Mays,* text accompanying n 46 *supra*), the courts limited damages "to the patient's lost chance of survival," *DeBurkarte, supra,* p 137, and that in two cases, the court viewed "the underlying injury, and not the lost chance of survival, as compensable." *Id.* The court was critical of the approach of those two courts because in permitting recovery for the underlying injury without requiring expert testimony that a physician's negligence probably caused the underlying injury, the court had departed from traditional principles of causation.

[31] *Id.* (lead opinion, p 619, concurring opinion, pp 634-635).

First, the critical element in each of the cases is that the defendant's negligence either deprived a decedent of a chance of surviving a potentially fatal condition or reduced that chance. To summarize, in *Hicks v United States* [32] the decedent was deprived of a probability of survival; in *Jeanes v Milner* [33] the decedent's chance of survival was reduced from 35 percent to 24 percent; in *O'Brien v Stover*,[34] the decedent's 30 percent chance of survival was reduced by an indeterminate amount; in *McBride v United States* [35] the decedent was deprived of the probability of survival; in *Kallenberg v Beth Israel Hosp* [36] the decedent was deprived of a 20 percent to 40 percent chance of survival; in *Hamil v Bashline* [37] the decedent was deprived of a 75 percent chance of survival; and in

[32] *Hicks v United States, supra,* p 632. See text accompanying n 22.

[33] In *Jeanes v Milner,* n 19 *supra,* p 604, the plaintiff alleged that the defendants failed to promptly send slides containing tissue taken from her son's throat to Barnes Hospital and to the Armed Forces Institute of Pathology for diagnosis. The plaintiff's expert testified that early diagnosis and treatment of lymphosarcoma, the disease that ultimately took the decedent's life, is essential. He also testified that during the delay in transmission of the slides, the decedent's cancer progressed from stage one (when there is a thirty-five percent chance of survival) to stage two (when survival decreases to twenty-four percent). The court concluded that this was sufficient evidence from which to infer that the decedent's "life would have been saved *or at least prolonged and his pain lessened had he received earlier treatment.*" (Emphasis added.)

[34] In *O'Brien,* n 19 *supra,* p 1019, the plaintiff alleged that the decedent's dentist had failed to diagnose cancer. The plaintiff's expert testified that the patient's cancer was probably present when the dentist first began to suspect that the patient had some systemic ailment, that a tissue biopsy would have revealed it, that the patient could have been treated, and that she probably would have lived longer and more comfortably. The expert also testified that the overall survival rate from the type cancer that had infected the patient was thirty percent and that the opportunity of survival is considerably improved with early diagnosis. The court said that the expert testimony of causation was sufficient to present a jury question under Iowa law. The court cited *Jeanes* and *Hicks* and approved as an element of damages the reduction of the patient's "chances for survival, or at least living longer and more comfortably . . . ."

[35] *McBride v United States,* 462 F2d 72 (CA 9, 1972).

[36] *Kallenberg v Beth Israel Hosp,* n 12 *supra.*

[37] *Hamil v Bashline,* n 11 *supra.*

*James v United States* [483 F Supp 581 (ND Cal, 1980)][38] the decedent was deprived of an indeterminate chance of survival, no matter how small.

The three cases where the chance of survival was greater than 50 percent (*Hicks, McBride,* and *Hamil*) are unexceptional in that they focus on the death of the decedent as the injury, and they require proximate cause to be shown beyond the balance of probabilities. Such a result is consistent with existing principles in this state, and with cases from other jurisdictions cited by defendant.

The remaining four cases allowed recovery despite the plaintiffs' failure to prove a probability of survival. *Three of these cases (Jeanes, O'Brien,* and *James) differ significantly from the Hicks, McBride,* and *Hamil group in that they view the reduction in or loss of the chance of survival, rather than the death itself, as the injury. Under these cases, the defendant is liable, not for all damages arising from the death, but only for damages to the extent of the diminished or lost chance of survival.* The fourth of these cases, *Kallenberg,* differs from the other three in that it focuses on the death as the compensable injury. This is clearly a distortion of traditional principles of proximate causation. In effect, *Kallenberg* held

---

[38] In *James v United States,* n 19 *supra,* p 587, the plaintiff contended that the defendant's failure to notify him of a tissue mass revealed in an x-ray deprived him of the opportunity of earlier radiation treatment that would have reduced the tumor's size and lowered the risk of metastasis. The court said:

> The Court therefore finds and concludes that plaintiffs have sustained their burden of proving that James would have benefited from early treatment, i.e., that discovery and disclosure in 1976 would have offered at least a chance that the tumor could be successfully treated and, even if not cured, its growth arrested or slowed. As a proximate result of defendant's negligence, James was deprived of the opportunity to receive early treatment and the chance of realizing any *resulting gain in his life expectancy and physical and mental comfort.* No matter how small that chance may have been—and its magnitude cannot be ascertained—*no one can say that the chance of prolonging one's life or decreasing suffering is valueless.* [Emphasis added.]

that a 40 percent possibility of causation (rather than the 51 percent required by a probability standard) was sufficient to establish liability for the death. Under this loosened standard of proof of causation, the defendant would be liable for all damages resulting from the death for which he was at most 40 percent responsible.

My review of these cases persuades me that the preferable approach to the problem before us is that taken (at least implicitly) in *Jeanes, O'Brien,* and *James.* [*Id.,* pp 631-632. Emphasis added.]

Finally, the opinion states "that the best resolution of the issue before us is to recognize the *loss of a less than even chance as an actionable injury." Id.,* p 634. (Emphasis added.)

In *Ehlinger v Sipes,* 155 Wis 2d 1, 13-14; 454 NW2d 754 (1990), parents were permitted to maintain an action alleging that the failure to diagnose a multiple pregnancy was a substantial factor in causing injuries to twins suffered when they were born prematurely. The court said:

We conclude that in a case of this nature, where the causal relationship between the defendant's alleged negligence and the plaintiff's harm can only be inferred by surmising as to what the plaintiff's condition would have been had the defendant exercised ordinary care, to satisfy his or her burden of production on causation, the plaintiff need only show that the omitted treatment was intended to prevent the very type of harm which resulted, that the plaintiff would have submitted to the treatment, and that it is more probable than not the treatment *could* have lessened or avoided the plaintiff's injury had it been rendered. It then is for the trier of fact to determine whether the defendant's negligence was a substantial factor in causing the plaintiff's harm. [Emphasis in original.]

In *Waffen v United States Dep't of Health &*

*Human Services,* 799 F2d 911 (CA 4, 1986), a lung cancer patient filed a medical malpractice claim, alleging failure to communicate, failure to supervise medical care, and abandonment.[39] The United States Court of Appeals for the Fourth Circuit, while retaining the requirement that a plaintiff must prove that the defendant's conduct more likely than not caused the injury, recognized loss of opportunity as a distinct injury.[40]

## VIII

The defendants contend, that the injury for which Falcon sought to maintain this wrongful death action, the failure to protect Nena Falcon's

[39] In March, 1981, Virginia Waffen was admitted to the Clinical Center at the National Institutes of Health and a chest x-ray was taken. The radiologist's report concluded that there was a three by five centimeter area of soft tissue density in the patient's lung and recommended a follow-up examination. The radiologist's report was "misplaced" and never placed in Waffen's medical file. The doctors who prepared and signed Waffen's discharge summary stated that Waffen's chest x-ray was "within normal limits" even though they had not seen the x-ray report.

A second chest x-ray was performed on October 28, 1981. This x-ray revealed a malignant "infiltrating carcinoma." The lesion measured approximately five by five centimeters. At this time it was discovered that an "error" had been committed.

The court said that by the time the opinion was written, it was clear that Waffen's cancer was terminal and that she had no hope of long-term survival. *Waffen v United States Dep't of Health & Human Services, supra,* pp 913-914.

[40] The court said:

What was significant about *Hicks* [*supra*], [*Thomas v*] *Corso* [265 Md 84; 288 A2d 379 (1972)], and *Hetrick* [*v Weimer,* 67 Md App 522; 508 A2d 522 (1986)] was their affirmation that a certain kind of harm (the loss of a "substantial possibility of survival") could be actionable. . . . [T]he plaintiff may now recover damages for showing such causation of a new kind of *harm:* loss of a substantial possibility of survival. [*Waffen,* p 918. Emphasis in original.]

The court in *Waffen* went on to hold that the plaintiff in that case had failed to establish that she had a "substantial possibility" of survival.

opportunity of avoiding physical harm, cannot be maintained because the proofs at trial will not show that it is probable, measured as more than fifty percent, that, had they protected her opportunity of living, she would not have died. Recognizing loss of a substantial opportunity of avoiding physical harm as actionable makes it unnecessary to consider whether Falcon's action for medical malpractice can be maintained as an action for wrongful death. Falcon may maintain a survival action against the defendants for their failure to protect Nena Falcon's opportunity of living.

The harm resulting from defendants' asserted malpractice occurred immediately before Nena Falcon's death when the medical accident occurred and, by reason of the failure to have inserted an intravenous line, it became certain that she would die. At that moment, immediately before her death, Nena Falcon had a cause of action for the harm, the denial of any opportunity of living, that had been caused her.[41] Her claim therefor survived her death because "[a]ll actions and claims survive death." RJA § 2921.[42]

---

[41] Patients have maintained actions for loss of opportunity during their lifetimes. See *Aasheim, supra,* text preceding n 31 on pp 462-463; *DeBurkarte, supra,* text accompanying n 30 *supra; Ehlinger, supra,* text preceding n 39 on p 467; *Waffen,* n 39 *supra.*

[42] Section 2921 goes on to provide that "[a]ctions on claims for injuries which result in death shall not be prosecuted after the death of the injured person except pursuant to" § 2922, which provides for the wrongful death action:

Whenever the death of a person or injuries resulting in death shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under circumstances that constitute a felony. [MCL 600.2922; MSA 27A.2922.]

We are persuaded that loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm.[43] We need not now decide what lesser percentage would constitute a substantial loss of opportunity.

See *Hawkins v Regional Medical Laboratories, PC,* 415 Mich 420, 436; 329 NW2d 729 (1982). See also *Herskovits v Group Health Cooperative of Puget Sound, supra,* p 634, where, in a concurring opinion signed by four of the six judges who comprised the majority, it was said that "[t]he decedent's personal action for loss of this chance [a fourteen percent reduction in his chances of survival] will survive to his personal representatives as provided by [Wash Rev Code Ann] 4.20.046." The cited statute provides that "[a]ll causes of action by a person or persons . . . shall survive to the personal representatives of [those persons], whether such actions arise on contract or otherwise, and whether or not such actions would have survived at the common law or prior to the date of enactment of this section . . . ."

[43] While in Nena Falcon's case the time interval between the loss of an opportunity for a better result and the resulting physical harm, her death, was relatively short, in other cases the time interval between the loss or reduction of the opportunity for a better result and the occurrence of physical harm will be considerably longer, as where there is a failure to diagnose or a misdiagnosis. The resulting physical harm, pain resulting from the spread of a disease that might have been avoided, pain resulting from medical treatment that might have been avoided, pain and suffering resulting from anxiety that might have been avoided, may extend over a prolonged period of time until death, remission, or a cure. A patient who suffers such harm as a result of a failure to diagnose or a misdiagnosis has an actionable claim for damages without regard to whether death ensues. See n 41.

The accrual of a cause of action for loss of an opportunity of achieving a better result does not, thus, depend on whether death ensues as a result. The cause of action accrues when harm and damages result from the loss of a substantial opportunity for a better result. The plaintiff has the burden of establishing through expert testimony the difference between the course of the disease and treatment had there been a correct diagnosis, and the course of the disease and treatment as a result of failure to diagnose or misdiagnosis.

The patient, or, if death ensues, his personal representative, need not show that it was probable, measured as more than fifty percent, that the course of the disease and treatment would have been different. It is sufficient to show, more probably than not, that had there been a correct diagnosis, the patient would have had a substantial opportunity of avoiding the course of the disease and treatment that occurred.

## IX

In the instant case, while Nena Falcon's cause of action accrued before her death,[44] she did not suffer conscious pain and suffering from the failure to implement the omitted procedures between the moment that the medical accident occurred and the time of her death a few minutes later—she was sedated throughout the entire time period. In this case, 37.5 percent times the damages recoverable for wrongful death would be an appropriate measure of damages.

The Supreme Court of Iowa differentiated loss of opportunity cases that allow a plaintiff to recover for the underlying injury from those[45] that limit damages to the patient's lost opportunity of survival. Criticizing the former group of cases, the court said:

> Under this reasoning, a patient could recover *all* damages resulting from an injury for which a defendant may only be partly responsible. It effectively allows a jury to speculate on causation because expert testimony that a physician's negligence *probably* caused the total damages is not required. This is an extreme position and clearly distorts the traditional principles of causation. [*DeBurkarte v Louvar, supra,* p 137. Emphasis in original.]

The court concluded that recovery should be allowed "*only* for the lost chance of survival." *Id.* (Emphasis in original.)

In *Mays v United States,* 608 F Supp 1476, 1482 (D Colo, 1985), the court found that the malpractice reduced the patient's opportunity of survival

[44] When, by reason of the failure to implement the procedures, it became certain she would die.

[45] The court cited *O'Brien,* n 19 *supra, James,* n 19 *supra,* and *Mays,* n 19 *supra.*

from forty to fifteen percent. In computing damages, the court multiplied the opportunity lost, twenty-five percent (forty percent less fifteen percent), by the net pecuniary loss to determine the damages caused by the defendant.[46] The plaintiff thus was permitted to recover damages only for the reduction in the patient's opportunity of survival.[47]

We would affirm the Court of Appeals reversal of the entry of summary judgment for the defendants, and remand the case for trial.

ARCHER, J., concurred with LEVIN, J.

BOYLE, J. (concurring). I concur in the recognition of "lost opportunity to survive" as injury for which tort law should allow recovery in proportion to the extent of the lost chance of survival, ante, p 466, provided that the negligence of the defendant

---

[46] The court explained:

The per cent of chance lost was 25. Therefore, the damage related to net pecuniary loss caused by defendant is .25 × 173,200 or $43,300. [Mays v United States, supra, p 1483.]

Wolfstone & Wolfstone, n 20 supra, p 144, explain the computation as follows:

[T]estimony as to what the probabilities were of the decedent surviving had she received proper treatment has particular probative value, and is essential in order for the jury to evaluate the value of the chance of which the decedent was deprived, since the jury would then have to be in a position of saying that the decedent was deprived of an x percent chance of surviving, that her life was worth y dollars, and that as a result the value of the chance was x times y dollars.

[47] The proper computation of damages would limit the damages recoverable to only that amount of reduced chance of recovery actually caused by the physician's negligent conduct. The theory, where adopted, should not result in an "all or nothing" approach to causation. [19 Wagner & Hart, Making a long shot longer, The Brief 12, 37 (Spring, 1990).]

more probably than not caused the loss of opportunity. However, I would emphasize that the Court today is called upon to decide the viability of a claim for "lost opportunity" only where the ultimate harm to the victim is death. Thus, any language in the lead opinion suggesting that a similar cause of action might lie for a lost opportunity of avoiding lesser physical harm is dicta. Whether the social and policy factors which justify compensation for a lost chance of survival would justify recovery for the loss of a chance to avoid some lesser harm is a question for another day.

CAVANAGH, J., concurred with BOYLE, J.

RILEY, C.J. (*dissenting*). I would hold that a wrongful death action[1] may not survive a motion for summary disposition where it is uncontested that the plaintiff cannot show that defendant's negligence caused the decedent's death, and will produce evidence only that the decedent would have had an increased chance of survival if the defendant, as in this case, had not negligently failed to insert an intravenous line before or immediately after administering saddle block anaesthesia.[2] Where plaintiff cannot show that defendants' omission was probably a cause of the death of Nena Falcon, the degree of certitude which would justify the imposition of liability on defendants is lacking. The recognition of mere chance as a recoverable item of loss fundamentally contradicts the essential notion of causation. By definition, the lost chance theory would compensate

---

[1] MCL 600.2922; MSA 27A.2922.

[2] The procedural posture of this case requires us to presume that defendants breached the applicable standard of care. Counsel for defendant Memorial Hospital conceded at oral argument that there was evidence from which a jury could find that it was a breach of the standard of care not to use an intravenous line.

plaintiff for a mere possibility that defendants' omission caused the death of Nena Falcon.

I

This is a wrongful death action grounded in allegations of medical malpractice. The action arises from the death of Nena J. Falcon on March 22, 1973. Ms. Falcon, then nineteen years old, was delivered of a healthy child at defendant Memorial Hospital, under the care of defendant Dr. S. N. Kelso, Jr. At the request of the decedent, Dr. Kelso administered a saddle block anaesthetic prior to delivery. No intravenous line was inserted before or after the administration of the spinal anaesthetic. Immediately after the delivery of the child at 6:39 A.M., and before the placenta was delivered, Nena Falcon coughed and went into a convulsive state. Nurse Norma Denny attempted to obtain a blood pressure reading but there was none, indicating cardiac arrest. At this time the decedent had no respirations. According to Dr. Kelso, the patient died within a few minutes. Efforts to resuscitate her were unsuccessful. Attempts to start an intravenous line were unsuccessful. A "cut down" into a central vein was also attempted, but fluids could not be run into the decedent's circulatory system because there was no circulation at this time. The autopsy revealed that the decedent had suffered an amniotic fluid embolism, an unpredictable and life threatening complication of pregnancy. There is no known way to prevent amniotic fluid embolism. While there are certain predisposing factors, it can occur in a person who is apparently healthy and normal.[3]

---

[3] While there was evidence that plaintiff was obese, a smoker, and suffering from a mild case of pneumonia at the time of the delivery, there is no record evidence that these factors put her at increased risk for amniotic fluid embolism.

The primary cause is a rent in the amnion[4] or chorion,[5] together with pressure sufficient to force the amniotic fluid into the circulatory system.

Plaintiff does not allege that defendant's negligence caused the embolism. Rather, plaintiff claims that the survival rate for women suffering this complication is 37.5 percent, but that due to defendant's negligence, Nena Falcon was deprived of that chance.

Plaintiff's claim is based primarily on the testimony of Dr. Ezzat Abouleish. Dr. Abouleish testified at the deposition that spinal anaesthesia should not be given without an intravenous line because spinal anaesthesia can lead to a decrease in blood pressure or respiratory depression. According to Dr. Abouleish, an intravenous line, had it been in place, would have provided Ms. Falcon's only chance of survival. Dr. Abouleish could not say that the failure to use an intravenous line was the cause of Ms. Falcon's death. He testified, however, that her chances of surviving the embolism would have been better if she had an intravenous line in place and fluids going into her bloodstream. If an intravenous line had been in place, Ms. Falcon could have been given drugs to stimulate her heart or dilate her bronchi.

Dr. Abouleish testified that the overall survival rate for women suffering amniotic fluid embolism is 37.5 percent. This number was calculated in the following manner: Of one hundred patients experiencing this complication, fifty will die within one hour and fifty will survive. Of the fifty survivors, twenty-five will develop a blood coagulation prob-

---

[4] The amnion is "the innermost of the embryonic or fetal membranes . . . the sac in which the embryo is suspended." *The Random House College Dictionary,* rev ed.

[5] The chorion is "the outermost of the extraembryonic membranes . . . ." *The Random House College Dictionary,* rev ed.

lem which will be fatal to half of those developing the problem. Thus, the statistical survival rate for amniotic fluid embolism is 37.5 percent. Dr. Abouleish testified that for a patient to have even that chance of survival, an intravenous line is essential.

Plaintiff also relies on the deposition testimony of Dr. Thomas DeKornfeld. Dr. DeKornfeld generally agreed with Dr. Abouleish's accounting of the survival statistics for women suffering amniotic fluid embolism, although he would not place the survival rate precisely at 37.5 percent. Dr. DeKornfeld testified that an intravenous line should be started immediately after the administration of a spinal anaesthetic, so that any complication arising from the spinal anaesthetic could be managed by injecting medication intravenously. While Dr. DeKornfeld opined that it was clearly inappropriate not to insert an intravenous line in the decedent, he was "not certain" that the presence of an intravenous line would have made any difference. When questioned further, DeKornfeld stated that intravenous infusion very likely would have made little if any difference in this case, but he conceded that "[t]here may have been a chance . . . ." DeKornfeld reiterated that opinion in cross-examination: He did not believe the presence of intravenous infusion would have materially affected the outcome, but he could not say it was inconceivable that an intravenous line might have changed the ultimate outcome.

A trial was held on January 7, 8 and 9, 1985. The trial ended with a directed verdict in favor of defendants after the trial court ruled that plaintiff had failed to present any expert testimony regarding the applicable standard of care for the doctor or nurse-anesthesiologist. That ruling was based on the trial court's determination that Drs.

Abouleish and DeKornfeld were not qualified to testify to the relevant standards of care. The Court of Appeals reversed the order granting the directed verdict, holding that both Drs. Abouleish and DeKornfeld were qualified to testify regarding the standard of care in Monroe, Michigan, or in similar communities.

On remand, defendants moved for summary disposition pursuant to MCR 2.116(C)(10).[6] Defendants argued that, since plaintiff conceded that the decedent's chance of survival was only 37.5 percent, under the best possible circumstances and in the absence of any negligence, plaintiff could not establish that any negligence by the defendants was the proximate cause of Nena Falcon's death. The trial court granted summary disposition in favor of defendants, stating that plaintiff could only prove "that the wrongful acts or omissions of the defendants caused her to lose a chance at life (37.5 percent), but could not prove that the defendants' acts or omissions caused her death."

The Court of Appeals reversed. *Falcon v Memorial Hosp,* 178 Mich App 17; 443 NW2d 431 (1989).

II

The decision of the Court of Appeals would require a plaintiff alleging medical malpractice to show only that a negligently omitted treatment or

---

[6] Summary disposition is appropriate under MCR 2.116(C)(10) when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." For purposes of reviewing the ruling under this subrule, we accept as true the deposition testimony of Drs. Abouleish and DeKornfeld that the failure to insert an intravenous catheter before or immediately after the administration of saddle block anaesthesia was a breach of the standard of care applicable to defendants at the time of the incident. We also take as true the allegations that the decedent would have had a 37.5 percent chance of survival if an intravenous line had been inserted, but because this was not done her chance of survival was eliminated.

procedure "had the potential for improving the patient's recovery or preventing the patient's death." 178 Mich App 26. The Court of Appeals held that "while a plaintiff must show some probability that the treatment would be successful, that probability need not be greater than fifty percent." *Id.,* pp 26-27. The analysis of the Court of Appeals turned on the meaning of the word "probability" in two cases decided by this Court.

In *Rogers v Kee,* 171 Mich 551; 137 NW 260 (1912), the plaintiff's proofs showed that the defendant physician failed to diagnose a fractured neck and femur. The Court in *Rogers* noted that the defendant not only had failed to diagnose the plaintiff's fractures, but had issued three successive diagnoses of conditions that the plaintiff did not have, and treated him for these conditions. *Id.,* p 558. The Court stated that pain and suffering from a wrong treatment are elements of damage, and further noted that some of the advice given could actually have been injurious to the plaintiff's condition. *Id.* On the basis of its conclusion that a jury could have found a better result probable but for defendant's negligence, the Court held that the case was properly submitted to a jury:

> [A] patient suffering from such an injury, on calling a physician, is entitled to approved methods of treatment from which experience of the profession indicates beneficial results are probable and to be anticipated; and, if not an entire recovery, a better ultimate condition than if left to chance. If so, can it not be legitimately inferred by a jury that plaintiff, a strong man, who, untreated and with his recovery left to chance, "shows as good results as would ordinarily obtain in a patient of his age under skillful treatment," if properly and skillfully treated would, in all probability,

have a better recovery and be in yet better condition? We think such testimony presents an issue of fact for the jury—on probability, it is true. The issues of sickness and healing, life and death, are too uncertain to be otherwise forecast, but negligence which deprives a man of such probability is more than *injuria sine damno.* [*Id.,* pp 561-562.]

Although the *Rogers* Court cited a definition of injury to the plaintiff as "[a]ny want of the proper degree of skill or care which diminishes the chances of the patient's recovery, prolongs his illness, increases his suffering, or, in short, makes his condition worse than it would have been if due skill and care had been used," it based its conclusion on an assessment of testimony tending to show that with proper treatment, "a bony union was possible and a better fibrous union *probable* . . . ." *Id.,* p 562 (emphasis added).

This Court again considered the problem of causation in a medical malpractice case in *Harvey v Silber,* 300 Mich 510; 2 NW2d 483 (1942). In *Harvey,* the negligence of the defendant doctors resulted in an inaccurate diagnosis of the course of the bullet that struck the decedent. *Id.,* p 520. The Court inferred from the record that the doctor who initially treated the decedent thought he felt the bullet under the skin on the right side of the decedent's abdomen. The x-rays revealed a bullet on the left side, but the chief of the x-ray department reversed the markings of left and right upon discovering that the treating doctor disagreed with his diagnosis finding a bullet on the left side. *Id.,* p 513. The decedent died after eighteen hours. The autopsy revealed blood in the abdomen sufficient to cause death. It also revealed that the bullet which had entered at the right back had traveled forward from right to left, lodging in the upper left side of the abdominal cavity. *Id.,* p 515. The

bullet had traveled through the intestines causing numerous perforations. *Id.* There was testimony that only by surgery could the hemorrhaging have been stopped. The Court in *Harvey* found sufficient evidence to support a finding of proximate cause, finding proof of "probability" sufficient:

> There is testimony in the record that there was a probability that an operation would have saved Harvey's life. Therefore the negligent diagnosis could be said to have been the proximate cause of the death. [*Id.,* p 520.]

The Court of Appeals carefully considered both *Rogers* and *Harvey,* and concluded that the test of "probability" employed in those cases was not an inquiry whether an event was more likely than not to happen. *Id.* The Court of Appeals noted that "the word 'probability' . . . also refers to the relative chances of an event happening, whether that 'probability' be low or high." 178 Mich App 26. Thus, the Court concluded, "while a plaintiff must show some probability that the treatment would be successful, that probability need not be greater than fifty percent." *Id.,* pp 26-27.

That the Court of Appeals misconstrued the rule of *Harvey* and *Rogers* is made perfectly clear by the *Harvey* Court's approval of an instruction which required the jury to find by a preponderance of the evidence that surgery would "with reasonable probability" have saved the decedent's life:

> "[Y]ou may not return a verdict for the plaintiff if he has shown only that surgical intervention *might possibly* have saved the life of Garfield Harvey, but, on the other hand, it is not incumbent on the plaintiff to show that *to a certainty* surgical intervention would have saved his life. It is sufficient if the plaintiff by a preponderance of

the evidence has satisfied you that surgical inter-
vention would *with reasonable probability* have
saved his life . . . ." [300 Mich 521. Emphasis
added.]

"Probability" thus means neither certainty nor
mere possibility. The Court of Appeals conclusion
that an omitted procedure need only have the
potential for preventing the death necessarily re-
duces the degree of certitude which is inherent in
the notion of causation from "probability" to mere
possibility.[7] The "lost chance of survival" theory
urged by plaintiff thus represents not only a re-
definition of the threshold of proof for causation,
but a fundamental redefinition of the meaning of
causation in tort law. To determine the wisdom of
that course, we look to the law of other jurisdic-
tions.

### III

The seminal case in the development of the lost
chance of survival theory is *Hicks v United States,*
368 F2d 626 (CA 4, 1966). *Hicks* itself is not a lost
chance of survival case, as there was testimony
that if the defendant had not negligently failed to
diagnose the decedent's intestinal obstruction, she
would have survived. In dicta, the court wrote:

When a defendant's negligent action or inaction
has effectively terminated a person's chance of
survival, it does not lie in the defendant's mouth
to raise conjectures as to the measure of the
chances that he has put beyond the possibility of

---

[7] In *Bell v United States,* 854 F2d 881 (CA 6, 1988), the United
States Court of Appeals for the Sixth Circuit rejected a "bright line"
requirement that the plaintiff prove the defendant's negligent failure
to diagnose an aneurysm deprived him of a fifty-one percent chance of
survival; the court correctly stated the Michigan rule as requiring
proof that the deceased had a "reasonable probability" of recovery but
for the defendant's negligence. *Id.,* p 883.

realization. If there was any substantial possibility
of survival and the defendant has destroyed it, he
is answerable. Rarely is it possible to demonstrate
to an absolute certainty what would have hap-
pened in circumstances that the wrongdoer did not
allow to come to pass. The law does not in the
existing circumstances require the plaintiff to
show to a certainty that the patient would have
lived had she been hospitalized and operated on
promptly.[8] [*Id.*, p 632.]

The court in *Hicks* analogized to the "lost sea-
man" case of *Gardner v Nat'l Bulk Carriers, Inc*,
310 F2d 284 (CA 4, 1962), cert den 372 US 913
(1963), where the court recognized a duty on the
part of a ship's master to use every reasonable
means to save the life of a man overboard. The
court rejected the defendant's contention that no
proximate cause was shown, finding proximate
cause implicit in the breach of the duty:

> [T]he duty would be empty if it did not itself
> embrace the loss as a consequence of its breach.
> Once the evidence sustains the reasonable possibil-
> ity of rescue, ample or narrow, according to the
> circumstances, total disregard of the duty, refusal
> to make even a try, as was the case here, imposes
> liability. [*Id.*, p 287.]

In *Hamil v Bashline*, 481 Pa 256; 392 A2d 1280
(1978), the Pennsylvania Supreme Court relied on

[8] Interestingly the court in *Hicks* cited the Michigan case of *Har-
vey, supra*, for its statement that the law does not require proof to a
certainty that the death of the decedent would have been avoided if
not for the defendant's negligence. In a footnote, the *Hicks* court
correctly interpreted the holding in *Harvey* to be that because there
was evidence that there was a *probability* that surgery would have
saved the decedent's life, the negligent diagnosis was the proximate
cause of the decedent's death. *Hicks, supra*, p 632, n 2.

§ 323(a) of the Restatement of Torts, 2d,[9] to similar effect in a medical malpractice case. The *Hamil* court concluded that where there is evidence that a defendant increased the risk of harm, "such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm . . . ." *Id.,* p 272. Thus the court accomplished an extraordinary transformation of traditional causation by allowing the jury to find causation in fact where the most that could be shown is that the defendant increased the risk of harm. As has been noted by courts criticizing the *Hamil* decision, § 323 simply establishes a duty where a person undertakes to render services to another to avoid increasing the risk of harm to the recipient. *Curry v Summer,* 136 Ill App 3d 468, 476; 483 NE2d 711 (1985). In order for liability to result from a violation of the duty described in § 323, the physical harm must "result[ ] from [the] failure to exercise reasonable care to perform [the] undertaking . . . ." Thus, the causation requirement is not obviated by § 323, as the court in *Hamil* effectively held. The court in *Hamil* need not have so drastically altered traditional concepts of causation, since there was evidence that the decedent would have had a seventy-five percent likelihood of survival absent defendant's negligence.

Several courts have employed an inquiry similar to that of the Pennsylvania Supreme Court in

[9] One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm . . . . [2 Restatement Torts, 2d, § 323, p 135.]

*Hamil.* In *Thornton v CAMC,* 305 SE2d 316, 325 (W Va, 1983), the court held that a defendant would be liable where the plaintiff could show that the defendant's acts or omissions increased the risk of harm and that such increased risk "was a substantial factor in bringing about the ultimate injury to the plaintiff . . . ." See also *Aasheim v Humberger,* 215 Mont 127, 146-147; 695 P2d 824 (1985); *Sharp v Kaiser Foundation Health Plan of Colorado,* 710 P2d 1153, 1156 (Colo App, 1985), aff'd 741 P2d 714 (Colo, 1987).[10]

While the court in *Hamil* openly recognized that the effect of the rule is "to relax the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury as to whether a defendant may be held liable for the plaintiff's injuries," *id.,* p 269, others have avoided overt alteration of the meaning of causation by redefining the compensable injury not as the ultimate harm, but as the lost chance of avoiding that harm.

In *Herskovits v Group Health Cooperative of Puget Sound,* 99 Wash 2d 609; 664 P2d 474 (1983), the Washington Supreme Court faced a situation where the plaintiff, suffering from lung cancer, had less than a fifty percent chance of survival at all times, but the defendants' negligence reduced the decedent's chance of survival by thirty-six percent (from thirty-nine to twenty-five percent). In a concurring opinion, Judge Pearson noted that in medical malpractice cases, cause in fact "must be established beyond the balance of probabilities." *Id.,* p 622. Furthermore, plaintiff's expert was unable to state that the defendants' negligence

---

[10] It is notable that a number of cases which have adopted the § 323 increased risk analysis have also limited the damages recoverable to those which the duty imposed was intended to prevent. *Thompson v Sun City Community Hosp,* 141 Ariz 597, 608; 688 P2d 605 (1984); *McKellips v St Francis Hosp,* 741 P2d 467 (Okla, 1987).

probably or more likely than not caused the death of the decedent. However, if the injury were viewed as a reduction in the chance of survival, a different result could be reached; the plaintiff's expert had testified that the failure to diagnose probably caused a substantial reduction in the decedent's chance of survival.

In *Waffen v United States Dep't of Health & Human Services,* 799 F2d 911, 917 (CA 4, 1986), the loss as a substantial chance of survival was recognized as a cognizable harm under Maryland law. The court thus avoided overt alteration of the rules of causation, holding that "plaintiff must submit proof that the injury complained of was 'more likely' or 'more probably' due to defendant's action rather than to any other cause." *Id.*

The lost chance theory is most fully explained in King, *Causation, valuation, and chance in personal injury torts involving preexisting conditions and future consequences,* 90 Yale L J 1353 (1981). The theory is premised on the reasoning that chance itself is an injury entitled to redress, and that chance should be measured by a mathematical percentage probability test:

> Causation has for the most part been treated as an all-or-nothing proposition. Either a loss was caused by the defendant or it was not. Inexplicably, the all-or-nothing approach of the causation inquiry has been allowed to slip its analytical moorings, influencing the identification and valuation of losses in cases involving preexisting conditions and claims for future consequences. A plaintiff ordinarily should be required to prove by the applicable standard of proof that the defendant caused the loss in question. *What* caused a loss, however, should be a separate question from what the *nature and extent* of the loss are. This distinction seems to have eluded the courts, with the

result that lost chances in many respects are compensated either as certainties or not at all.

To illustrate, consider the case in which a doctor negligently fails to diagnose a patient's cancerous condition until it has become inoperable. Assume further that even with a timely diagnosis the patient would have had only a 30% chance of recovering from the disease and surviving over the long term. There are two ways of handling such a case. Under the traditional approach, this loss of a not-better-than-even chance of recovering from the cancer would not be compensable because it did not appear more likely [than] not that the patient would have survived with proper care. Recoverable damages, if any, would depend on the extent to which it appeared that cancer killed the patient sooner than it would have with timely diagnosis and treatment, and on the extent to which the delay in diagnosis aggravated the patient's condition, such as by causing additional pain. A more rational approach, however, would allow recovery for the loss of the chance of cure even though the chance was not better than even. The probability of long-term survival would be reflected in the amount of damages awarded for the loss of the chance. While the plaintiff here could not prove by a preponderance of the evidence that he was denied a cure by the defendant's negligence, he could show by a preponderance that he was deprived of a 30% chance of a cure. [*Id.*, pp 1363-1364. Emphasis in original.]

A number of cases adopting the lost chance of survival theory also adopt Professor King's statistical approach, holding that if a decedent had, for example, a thirty percent chance of survival, then compensation should be awarded for thirty percent of the value of the decedent's life. See *Boody v United States,* 706 F Supp 1458, 1465 (D Kan, 1989); *McKellips v St Francis Hosp,* 741 P2d 467, 476 (Okla, 1987).

The number of jurisdictions adopting some ver-

sion of the lost chance of survival theory is fairly
evenly matched by the number of states which
continue to require that a defendant's negligence
probably caused the adverse result before a defen-
dant is required to pay for the plaintiff's dam-
ages.[11] Many of these courts refer to the burden of
proof for causation: a plaintiff must prove that the
defendant's negligence more likely than not
caused the plaintiff's injury. See, e.g., *Cooper v
Sisters of Charity of Cincinnati*, 27 Ohio St 2d 242,
250-252; 272 NE2d 97 (1971); *Weimer v Hetrick*,
309 Md 536; 525 A2d 643 (1987).[12] A number of
courts, even while treating the matter as an issue
of burden of proof, have recognized that the ques-
tion goes to the heart of the meaning of causation.
Thus, the New Hampshire Supreme Court wrote
that "[c]ausation is a matter of probability, not
possibility." *Pillsbury-Flood v Portsmouth Hosp*,
128 NH 299, 305; 512 A2d 1126 (1986). The Florida
Supreme Court in *Gooding v Univ Hosp Bldg, Inc*,
445 So 2d 1015, 1018 (Fla, 1984), cogently stated

[11] Cases retaining the more likely than not standard for causation
in medical malpractice cases include *Alfonso v Lund*, 783 F2d 958 (CA
10, 1986) (applying New Mexico law); *Connellan v Coffey*, 122 Conn
136; 187 A 901 (1936); *LaBieniec v Baker*, 11 Conn App 199; 526 A2d
1341 (1987); *Gooding v Univ Hosp Bldg, Inc*, 445 So 2d 1015, 1018 (Fla,
1984); *Walden v Jones*, 439 SW2d 571 (Ky, 1978); *Anthony v Hosp
Service Dist No 1*, 477 So 2d 1180 (La App, 1985); *Cornfeldt v Tongen*,
295 NW2d 638 (Minn, 1980); *Ladner v Campbell*, 515 So 2d 882 (Miss,
1987); *Pillsbury-Flood v Portsmouth Hosp*, 128 NH 299; 512 A2d 1126
(1986); *Cooper v Sisters of Charity of Cincinnati*, 27 Ohio St 2d 242;
272 NE2d 97 (1971). There are several jurisdictions in which conflict-
ing decisions exist, see 54 ALR4th 10, § 7, p 42.

[12] As noted, *ante*, pp 485-486, the United States Court of Appeals
for the Fourth Circuit interpreted Maryland law to allow recovery for
the loss of a chance of survival. *Waffen, supra*. The Maryland Court of
Appeals in *Weimer* approved the traditional standard of proof for
causation, but resolved the case solely by reference to Maryland's
wrongful death statute, which allowed an action against a person
"whose wrongful act caused the death of another . . . ." *Id.*, p 554. In
*Cooper v Hartman*, 311 Md 259, 261; 533 A2d 1294 (1987), the
Maryland Supreme Court expressly declined to decide whether to
adopt the "lost chance" doctrine.

its reasons for declining to relax the causation requirement in medical malpractice cases:

> Relaxing the causation requirement might correct a perceived unfairness to some plaintiffs who could prove the possibility that the medical malpractice caused an injury but could not prove the probability of causation, but at the same time could create an injustice. Health care providers could find themselves defending cases simply because a patient fails to improve or where serious disease processes are not arrested because another course of action could possibly bring a better result. No other professional malpractice defendant carries this burden of liability without the requirement that plaintiffs prove the alleged negligence probably rather than possibly caused the injury. We cannot approve the substitution of such an obvious inequity for a perceived one. [*Id.*, pp 1019-1020. Citation omitted.]

### IV

The lost chance of survival theory does more than merely lower the threshold of proof of causation; it fundamentally alters the meaning of causation.

The most fundamental premise upon which liability for a negligent act may be based is cause in fact. *Glinski v Szylling,* 358 Mich 182, 196-197; 99 NW2d 637 (1959). "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." Prosser & Keeton, Torts (5th ed), § 41, p 265. If the defendant's acts did not actually cause the plaintiff's injury, then there is no rational justification for requiring the defendant to bear the cost of the plaintiff's damages. Thus, it is the plaintiff's burden to show a causal connection between negligence and injury. *Glinski, supra,* p 201. "A case cannot go to a jury supported merely by sheer speculation that something might have been a

cause, or, going one step further, that there was a possibility that something was the cause." *Id.,* pp 201-202.

The recognition of a lost chance as a cognizable injury is necessarily based on the reasoning that but for the defendant's negligence, the plaintiff *might possibly* have avoided an adverse result. Thus, recognition of lost chance as a recoverable interest contradicts the very notion of cause in fact. Professor King aptly characterizes a lost chance as a "raffle ticket" destroyed by the defendant's negligence.[13] King, *supra,* p 1378. King advocates compensation for "statistically demonstrable losses," *id.,* p 1377, so that a person deprived of a forty percent chance of survival should be compensated for forty percent of the compensable value of his life. *Id.,* p 1382. Thus, tort law is transformed from a compensatory system to a payout scheme on the basis of a statistical chance that the defendant caused the plaintiff's death. It is no answer that full compensation based on less than a certainty that a patient would have survived is over-compensation. Professor King criticizes the probability standard of causation because, in his view, it treats the better-than-even chance as a certainty, "as though it had materialized or were certain to do so." *Id.,* p 1387. Clearly, causation can never be proven to a certainty; the law settles for less in determining that a defendant should be held liable

---

[13] This Court expressed its reluctance to compensate for mere chance when it held in *Larson v Johns-Manville Sales Corp,* 427 Mich 301, 305; 399 NW2d 1 (1986), that a plaintiff who contracts asbestosis but does not bring suit is not barred from later bringing suit when he knows or should know he has developed cancer as a result of the asbestosis. The Court reasoned:

Rather than encouraging every plaintiff who develops asbestosis to recover an amount of money as compensation for the chance of getting cancer, we prefer to allow those who actually do develop cancer to obtain a full recovery. [*Id.,* p 319.]

for damages to a plaintiff.[14] Thus, Professor McCormick describes the preponderance of the evidence standard of proof in terms of "probability":

> The most acceptable meaning to be given to the expression, proof by a preponderance, seems to be proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence. Thus the preponderance of evidence becomes the trier's belief in the preponderance of probability. [McCormick, Evidence (3d ed), § 339, p 957.]

McCormick notes that some courts are "shocked at the suggestion that a verdict, a truth-finding, should be based on nothing stronger than an estimate of probabilities." *Id.,* p 958. This statement reveals the very foundation of the tort system. Imperfect as it may be, our legal system attempts to ascertain facts to arrive at the truth. To protect the integrity of that goal, there must be some degree of certainty regarding causation before a jury may determine as fact that a medical defendant did cause the plaintiff's injury and should therefore compensate the plaintiff in damages. To dispense with this requirement is to abandon the truth-seeking function of the law. Professor King is willing to do so in his attempt to compensate for the precise magnitude of any lost chance. Professor King's criticism of the more likely than not standard for causation, like the lost chance theory itself, is based on the erroneous premise that it is the purpose of tort law to compensate for lost chances. But tort law should not operate by the

---

[14] McCormick notes that standards of proof ultimately are concerned with the state of the jury's mind rather than the evidence itself. McCormick, Evidence (3d ed), § 339, p 956. Thus, the preponderance of the evidence standard properly refers not to the weight of evidence, but to the degree of certainty which it might inspire in the minds of jurors. *Id.*

same principles that govern lotteries and insurance policies. If the acts of the defendants did not actually cause plaintiff's injury, then there is no rational justification for requiring defendants to bear the cost of plaintiff's damages.

Even where there is causation in fact, a weighing of social interests requires a limit on how far the consequences of negligence will extend.

> As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy. [Prosser & Keeton, Torts, 5th ed, § 41, p 264.]

Thus, "[b]y adjusting the causation requirement, the court is able to strike a balance between deterring harmful behavior and encouraging useful activity." *Abel v Eli Lilly & Co,* 418 Mich 311, 324, n 8; 343 NW2d 164 (1984), cert den 469 US 833 (1984). If liability is to be imposed in proportion to any chance at survival, then the medical profession will be subjected to a burden which is not imposed on any other group of defendants. *Cooper, supra.* I submit that nothing is to be gained by extracting payment from a defendant who cannot be shown to have caused the adverse result. Such a rule will not serve the deterrence function of tort law. It more likely will encourage the practice of costly defensive medicine in an attempt to avoid practically certain liability in the event of an unfavorable outcome.

The utility of the physician's conduct militates against a relaxation of the causation requirement in medical malpractice cases. "The physician serves a vital function in our society, a function

which requires the assumption of a duty to the patient. Yet, his profession affords him only an inexact and often experimental science by which to discharge his duty." *Herskovits, supra,* p 638 (Brachtenbach, J., dissenting). See also Malone, *Ruminations on cause-in-fact,* 9 Stan L R 60, 86-87 (1956). This is not similar to the case in which two shooters are held liable because it cannot be determined whose bullet caused the victim's death, *Summers v Tice,* 33 Cal 2d 80; 199 P2d 1 (1948). Under those circumstances, the utility of the actors' conduct is so low that it is not troubling to permit recovery against both on the theory of concert of action, even where causation can be attributed to neither by a preponderance of the evidence.[15] See Prosser & Keeton, Torts, § 41, p 271. In *Abel v Eli Lilly, supra,* p 327, this Court discussed *Summers v Tice* and the rationale for its rule, which is embodied in 2 Restatement Torts, 2d, § 433B(3), comment f, p 446:

> [T]he reason for the exception to traditional rules is to prevent the injustice of allowing proved wrongdoers to escape liability for an injury inflicted upon an innocent plaintiff "merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm."

The Court in *Abel* relied on this rationale to fashion a "DES-unique" theory of alternative liability, where it could be shown that all of the defendants acted tortiously, and that the plaintiff was harmed by the conduct of one of the defendants.

---

[15] Nor can this case be compared with a situation in which a captain of a ship is held liable for failure to rescue a man overboard, where only a chance of survival could be shown had rescue been attempted. There is little imaginable utility in a decision by the ship's captain to decline a rescue attempt. *Gardner v Nat'l Bulk Carriers, supra.*

*Id.,* p 331. Assuming as we must that defendants Kelso and Memorial Hospital acted tortiously, there remains a crucial distinction between *Abel* and this case. In *Abel,* it was known that one of the defendants caused each plaintiff's injury. In this case, the question is not who caused Nena Falcon's death; the question, for which we have no answer, is whether any human act or omission caused her death. I do not mean to minimize the tragedy of such events, but only to question the assumption that a human cause may be located.

V

In this case, there is deposition testimony from which it could be inferred that the decedent was deprived of a 37.5 percent chance of survival by the failure of Dr. Kelso to insert an intravenous line before or immediately after the administration of a saddle block anaesthetic. Plaintiff does not assert that evidence showing any greater likelihood of survival will be produced at trial; it is plaintiff's theory that the lost chance of survival should itself be compensated. Where the plaintiff can show no more than a possibility that the defendants' conduct was a cause of the harm, I would conclude that the plaintiff has not produced adequate evidence to create a factual issue regarding causation. *Rogers, Harvey, supra.* Inherent in the concept of causation is a degree of certitude which is absolutely lacking in this case. Our case law wisely requires evidence from which it may be inferred that the defendant *probably* caused the ultimate harm before the jury may be allowed to infer that the defendant did cause such harm and should compensate the plaintiff in damages.

Also inherent in the concept of causation is the notion of foreseeability. The scope of liability

should ordinarily extend to, but not beyond, the
scope of the "foreseeable risks"—that is, the risks
by reason of which the actor's conduct is held
negligent. Prosser & Keeton, § 42, p 273. In this
case, there is absolutely no evidence that the
purpose of an intravenous line would have been to
prevent an amniotic fluid embolism. Similarly,
there is a total absence of evidence that the pur-
pose of an intravenous line was to manage or treat
this unpredictable complication of labor. Instead,
all of plaintiff's evidence points to the conclusion
that the reason for inserting an intravenous line
would have been to manage the potential compli-
cations of the saddle block anaesthetic. Under
these circumstances, even assuming that compen-
sation should be granted where defendant has
caused the loss of a mere chance, plaintiff lacks
evidence on which a showing of causation may be
predicated. In other words, plaintiff cannot even
prove that defendant caused the loss of a 37.5
percent chance of survival.

## CONCLUSION

I disagree with the adoption of the lost chance of
survival theory. The recovery of damages for the
loss of a mere chance eviscerates the principles
that underlie our tort law. By identifying the
ultimate harm underlying a wrongful death action
as the loss of a chance at survival, the lead opin-
ion abandons the most fundamental negligence
element of cause in fact. By definition, the recov-
ery sanctioned today is based on the mere possibil-
ity that the acts of the defendants caused the
death of Nena Falcon. I believe it is unwise to
impose liability on members of the medical profes-
sion in such difficult circumstances as those now
before this Court. Rather than deterring undesira-

ble conduct, the rule imposed only penalizes the medical professional for inevitable unfavorable results. The lost chance of survival theory presumes to know the unknowable. There is little satisfaction or comfort in the conclusion that we simply cannot know why Nena Falcon died. The desire to compensate for the chance that the decedent might have survived, while understandable, is not justifiable.

BRICKLEY and GRIFFIN, JJ., concurred with RILEY, C.J.