NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0815n.06

No. 09-2327

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Dec 07, 2011**

LEONARD GREEN, Clerk

BRENDA KAVA AND BRADLEY KAVA,   )
                                )
    *Plaintiffs-Appellants*,    )
                                )
v.                              )
                                )
MICHAEL J. PETERS, II,          )
                                )
    *Defendant-Appellee*,       )
                                )
and                             )
                                )
JAMES P. VAN WAGNER; MVP        )
ORTHOPEDICS & SPORTS MEDICINE,  )
                                )
    *Defendants.*               )

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

**O P I N I O N**

BEFORE:  GIBBONS and WHITE, Circuit Judges; and OLIVER, Chief District Judge.[*]

   **SOLOMON OLIVER, JR., Chief District Judge.** Plaintiffs-Appellants, Brenda Kava and

her husband, Bradley Kava (collectively, the "Kavas" or "Plaintiffs"), appeal the order of the district

court, granting summary judgment in favor of Defendant-Appellee, Dr. Michael J. Peters

("Dr. Peters" or "Defendant"), of the Kavas' ordinary medical-malpractice, loss-of-opportunity and

loss-of-consortium claims.  For the following reasons, we **AFFIRM** the decision of the district court.

---

   [*] The Honorable Solomon Oliver, Jr., Chief Judge of the United States District Court for the
Northern District of Ohio, sitting by designation.

# I. FACTUAL AND PROCEDURAL HISTORY

In August 2005, Plaintiff Brenda Kava ("Mrs. Kava") suffered a dislocated shoulder. The Kavas sought treatment at a hospital in Traverse City, Michigan. Mrs. Kava checked into the hospital emergency room where x-rays of her shoulder were taken and she was referred to James P. Van Wagner, D.O. ("Dr. Van Wagner"). On September 12, 2005, Dr. Van Wagner performed shoulder reconstructive surgery on Mrs. Kava. When Mrs. Kava returned to Dr. Van Wagner nine days later reporting "great pain," he did not investigate the cause of her pain. Instead, Dr. Van Wagner advised her to begin physical therapy, and scheduled her for a follow-up appointment four weeks later.

Two weeks after her surgery, on September 25, 2005, Mrs. Kava became extremely ill and was hospitalized. She was diagnosed with pneumonia and remained in the hospital for three days. During the hospitalization, Mrs. Kava was monitored every day by Dr. Mary Clifton ("Dr. Clifton"), who reported that Mrs. Kava's shoulder was painful and swollen. Dr. Clifton asked Dr. Van Wagner to see Mrs. Kava on multiple occasions when she was in the hospital, reporting "postoperative fluid collection about the left shoulder," which she noted might be "an infected fluid." Dr. Van Wagner, however, never saw Mrs. Kava, and she was discharged from the hospital on September 30, 2005. Feeling a need to get an appointment with Dr. Van Wagner earlier than her scheduled appointment, Mrs. Kava made numerous attempts to get in contact with him between October 9, 2005 and October 18, 2005. She was unsuccessful. Frustrated, Mrs. Kava contacted Dr. Clifton for a referral to another orthopedic surgeon. Dr. Clifton put Mrs. Kava in contact with Dr. Peters, who saw her for the first time on October 19, 2005. Dr. Peters's physical examination and x-ray of Mrs. Kava's shoulder revealed "nothing of concern." Dr. Peters prescribed pain medications and physical

therapy, and Mrs. Kava made a follow-up appointment for four weeks later.  However, Mrs. Kava began experiencing excessive shoulder pain and was seen again by Dr. Peters on November 10, 2005.  Dr. Peters observed a change in her condition, including "increased pain in the left shoulder accompanied by pronounced weakness and even numbness extending down into her hand."  Dr. Peters ordered additional x-rays and a MRI, which Munson Hospital scheduled for the next available opening on November 23, 2005.

When Mrs. Kava's discomfort continued to increase, her physical therapist contacted Dr. Peters's office two days before the scheduled MRI, requesting that she be seen immediately.  Because Dr. Peters was not in the office, Mrs. Kava was seen by another physician who noted she was exhibiting signs of a shoulder infection including fever, redness, warmth to the touch, and induration.[1]  Blood tests were ordered, and a MRI was immediately completed, which revealed the presence of an infection in Mrs. Kava's shoulder.  Subsequently, Mrs. Kava checked into Munson Hospital where her shoulder was cleaned out and she received antibiotics.  Unfortunately, the infection caused significant damage to her shoulder, and the damaged portion of her shoulder had to be replaced in April 2006.

On May 25, 2007, the Kavas filed the instant action in the United States District Court for the Western District of Michigan, asserting medical malpractice against Dr. Van Wagner, MVP Orthopedics & Sports Medicine ("MVP"), and Dr. Peters.  Plaintiffs settled their claims against Dr. Van Wagner and MVP.  The Kavas allege in their Complaint that on October 19, 2005, Dr. Peters did not properly diagnose, or order tests to diagnose, the postoperative infection in Mrs. Kava's shoulder, and that his inaction caused permanent damage to her shoulder.  As a

---

[1] Sclerosis or hardening of the tissues.

consequence, his inaction constitutes medical malpractice. (Compl., ¶¶ 23, 26, 28.) To support their claim, the Kavas presented the expert opinion of Dr. Lawrence A. Kriegshauser ("Dr. Kriegshauser"), who offered deposition testimony regarding the nature and cause of Mrs. Kava's injuries.

On January 30, 2009, Dr. Peters filed a Motion for Summary Judgment, or Alternatively, for Partial Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c). Dr. Peters sought judgment as a matter of law on the following grounds: (1) Kavas' expert testimony was insufficient evidence to meet the minimum requirements of causation under a traditional medical malpractice claim; (2) Kavas' expert testimony was insufficient to establish causation for a loss-of-opportunity claim; and (3) Kavas' damages for the medical malpractice claims were speculative and could not be the basis upon which a jury could make a reasonable assessment of damages. (Def. Dr. Peters's Mot. for Summ. J., Dist. Ct. Dkt., ECF No. 124-2.) On February 20, 2009, the Kavas filed a Brief in Opposition. (Pls.'s Br. in Opp'n, Dist. Ct. Dkt., ECF No. 128-2.) The Kavas attached to their Brief in Opposition an affidavit signed by Dr. Donnis Harrison ("Dr. Harrison"), the orthopedic surgeon who performed the partial shoulder replacement surgery in April 2006 regarding Mrs. Kava's injuries and their cause. (Harrison Aff., Dist. Ct. Dkt., ECF. No. 128-3, Ex. 1.)[2] On August 24, 2009, the district court held a hearing on Dr. Peters's Motion for Summary Judgment.

---

[2] Dr. Peters objected to Dr. Harrison's affidavit, arguing that it should not be considered because it was submitted late "after discovery and after the motion for summary judgment was filed." *Kava v. Van Wagner*, D.O. et al., No. 1:07-CV-507, 2009 WL 2948490, *5, n.4 (W.D. Mich. 2009). Further, Dr. Peters asserted that Dr. Harrison was identified as a "treater" and not as an expert on causation. The district court found it unnecessary to decide this issue because "Dr. Harrison's affidavit does not materially add to Plaintiffs' evidence." *Id.*

4

On September 3, 2009, the district court granted Dr. Peters's Motion for Summary Judgment on all of the Kavas' claims: traditional medical-malpractice claim; loss-of-opportunity medical-malpractice claim; and loss-of-consortium claim. As an initial matter, the court took note of the Kavas' acknowledgment that Dr. Peters is not liable for any damages Mrs. Kava sustained prior to October 19, 2005, the date on which Dr. Peters first saw her for her shoulder. *Kava v. Van Wagner, D.O., et al.*, No. 1:07-CV-507, 2009 WL 2948490, *2 (W.D. Mich. September 3, 2009) (citing Dist. Ct. Dkt., ECF No. 128) ("Plaintiffs conceded that any damages sustained by Plaintiffs prior to October 19, 2005 . . . are not attributable to Defendant Peters."). Turning to the Kavas' claims against Dr. Peters, the district court noted that the application of the Michigan medical malpractice statute, Mich. Comp. Law § 600.2912a(2), "has been the subject of much debate and confusion amongst the courts." *Id.* at *3. The court stated that "Plaintiffs appeared to be conflicted as to which type of claim they are pursuing," a traditional claim or a loss-of-opportunity claim, but determined that, "regardless of whether the Court construes Plaintiffs' claim as a traditional claim or as a lost opportunity claim, [the claims] fail[] as a matter of law." *Id.* at *4.

In discussing the traditional medical-malpractice claim, the district court found that the expert testimony presented by the Kavas did not show that Dr. Peters's negligence proximately caused the injury necessitating Mrs. Kava's shoulder replacement surgery. *Id.* at *4–5. Further, the district court granted summary judgment on Mrs. Kava's claim for loss-of-opportunity to avoid the shoulder replacement surgery and obtain some better outcome. While the Kavas' experts testified that Dr. Peters's negligence decreased Mrs. Kava's opportunity for some "better outcome," the court concluded that this testimony was too speculative to provide a basis for a jury to award damages. *Id.* at *5–6.

5

## II. STANDARD OF REVIEW

A district court's decision to grant a motion for summary judgment is subject to *de novo* review. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits show that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *overruled in part on other grounds*, *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 217 n.4 (6th Cir. 1992). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999). The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). If the burden of persuasion at trial would be on the nonmoving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential

element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

## III. LEGAL ANALYSIS

### A. Medical-Malpractice and Loss-of-Opportunity Claims under Michigan Law

Under Michigan law, a plaintiff bringing a cause of action for medical malpractice must establish the following elements:

> (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care.

*Craig, ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 308 (Mich. 2004). Medical-malpractice actions are further subject to Mich. Comp. Laws § 600.2912a, which governs the burden of proof in such actions. *O'Neal v. St. John Hosp. & Med. Ctr.*, 791 N.W.2d 853, 857 (Mich. 2010). At issue in this case is subsection (2) of § 600.2912a, which provides that:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

Mich. Comp. Laws § 600.2912a(2) (West 2009).

The first sentence of § 600.2912a(2) governs traditional medical-malpractice actions and "restates the well-accepted, well-established historical rule for proximate causation" that "the negligent conduct must have been a cause of the plaintiff's injury and the plaintiff's injury must have been a natural and probable result of the negligent conduct." *O'Neal*, 791 N.W.2d at 858. Stated

7

otherwise, the plaintiff must establish "cause-in-fact" and "legal cause." *Id.* (citing *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994).)

The second sentence of § 600.2912a(2) addresses a "subcategory of injuries in medical malpractice litigation governed by the loss-of-opportunity doctrine." *Id.* at 857. The loss-of-opportunity doctrine is an alternative theory of recovery that is "potentially available in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries, but can prove that the defendant's actions deprived him of a chance to avoid those injuries." *Stone v. Williamson*, 753 N.W.2d 106, 110 (Mich. 2008); *see also Ykimoff v. Foote Mem'l Hosp.*, 776 N.W.2d 114, 127 (Mich. Ct. App. 2009). In Michigan, the loss-of-opportunity doctrine was first recognized in *Falcon v. Mem'l Hosp.*, 462 N.W.2d 44 (Mich. 1990), *superseded by statute as recognized in Blair v. Hutzel Hosp.*, 552 N.W.2d 507, 508 n.1 (Mich. Ct. App. 1996). In that case, plaintiff Ruby Falcon brought suit on behalf of the estate of her granddaughter Nena Falcon, who died moments after giving birth to a healthy baby. *Id.* at 45, 49. The autopsy report revealed that the cause of death was amniotic fluid embolism, "an unpreventable complication that occurs in approximately one out of ten or twenty thousand births." *Id.* at 49. According to Falcon's expert witness, women developing an amniotic fluid embolism after giving birth have a 37.5 percent change of survival "if an intravenous line is connected to the patient before the onset of embolism." *Id.* In Falcon's case, no intravenous line had been connected to her. *Id.* Her theory of recovery was that by not inserting an intravenous line at the appropriate moment, her physician deprived her of a 37.5 percent chance of surviving the embolism. *Id.* The court held that plaintiff could bring a claim for the decedent's loss of opportunity to survive because it was "persuaded that loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm." *Id.* at 56. Mich. Comp. Laws

§ 600.2912a was amended in 1993 to add subsection (2). *See O'Neal*, 791 N.W.2d at 857–58 (discussing legislative history). The second sentence of subsection (2) modified the *Falcon* rule by providing that in loss-of-opportunity cases, the opportunity "must be greater than 50%."

While the Michigan Supreme Court has been inconsistent in defining the parameters of a loss-of-opportunity claim under § 600.2912a(2), the Court and court of appeals have nevertheless consistently noted that the statute recognizes two distinct theories of recovery. *See O'Neal*, 791 N.W.2d at 857–59; *Taylor v. Kent Radiology*, 780 N.W.2d 900, 911 (Mich. Ct. App. 2009) ("MCL 600.2912a(2) . . . recognizes a cause of action for lost opportunity that is separate and distinct from the traditional medical malpractice claim.") Regardless of the theory of recovery pursued by the plaintiff, the four elements of the *prima facie* case–the standard of care, breach of that standard, injury, and causation–must be established. *Lanigan v. Huron Valley Hosp., Inc.*, 766 N.W.2d 896, 900 (Mich. Ct. App. 2009). Further, "[a] plaintiff's theory in a medical malpractice case must be pleaded with specificity and the proofs must be limited in accordance with the theories pleaded." *Badalamenti v. William Beaumont Hosp.-Troy*, 602 N.W.2d 854, 857–58 (Mich. Ct. App. 1999); *Taylor*, 780 N.W.2d at 913.

As a general rule, Michigan courts require expert testimony in medical-malpractice cases, particularly for establishing the applicable standard of care and causation. *Pennington v. Longabaugh*, 719 N.W.2d 616, 618 (Mich. Ct. App. 2006); *Thomas v. McPherson Cmty. Health Ctr.*, 400 N.W.2d 629, 631 (Mich. Ct. App. 1986).

### B. Mrs. Kava's Ordinary Medical Malpractice Claim

The Kavas' first claim is that the district court erred in granting summary judgment in favor of Defendant with respect to Mrs. Kava's ordinary medical-malpractice claim. The district court

held that "the uncontroverted evidence . . . indicates that, even if Plaintiff had received treatment beginning on October 19, 2005," the date of Mrs. Kava's initial consultation with Dr. Peters, "Plaintiff's shoulder would have sustained some permanent damage." *Kava*, 2009 WL 2948490 at *5. The court found the deposition testimony of Mrs. Kava's own expert, Dr Kriegshauser, to be fatal to Mrs. Kava's claims against Dr. Peters. It noted that Dr. Kriegshauser testified that in his opinion, Plaintiff's shoulder was already infected on October 19, 2005, the date of her initial consultation with Dr. Peters, and that the infection had developed at some time prior to this date. *Id.* at *4. He added that damage to cartilage can occur as early as twenty-four hours after infection, but "most of the time" there is a window of opportunity, lasting only a few days, where the infection can be treated and the joint can be salvaged before there is significant damage to the cartilage. *Id.* If the infection progresses, however, there comes a "point of no return" after which the joint cannot be salvaged. *Id.* When asked whether, on October 19, 2005, Mrs. Kava was at this "point of no return," Dr. Kriegshauser answered:

> A: I really don't know. I don't know if anybody could honestly say that unless they had gone in on that date to operate and debride it and describe the joint or if you had an MRI from that date. . . . Whether it was salvageable at that time I really don't know.

> Q: Is it possible that it was not?

> A: Sure, I mean, as they always say in medicine, anything is possible, but I can't give you an honest percentage if treatment had begun on [October] 19th what the chance it would be that she'd have ended up with a functional shoulder.

> Q: So you can't state to a reasonable degree of medical certainty whether she would have had a significant improvement or what that improvement would have been; is that what I hear you saying?

> A: Yeah, I think that's true. . . . I think she certainly would have had some permanent morbidity even if treatment had begun at that time. . .

10

Q: But you can't state more likely than not she would have had a greater than 50 percentage point chance of a better outcome or something along those lines in this case?

A: I can't really give you a percentage. . . . [W]hether the need for artificial replacement could have been prevented I can't really state.

Q: Okay. And you can't state that more likely than not [the need for an artificial replacement could have been prevented]?

A: No, probably not.

This testimony provided the basis for the district court's holding that Plaintiffs failed to offer sufficient evidence to raise a genuine issue of material fact that Dr. Peters's negligence was the proximate cause of Mrs. Kava's injury. The district court further held that "[a]ssuming that Defendants' alleged negligence was the proximate cause of some additional damage, there is no evidence that Defendant's negligence was the proximate cause of damage necessitating shoulder replacement surgery." *Id.* at *5.

On appeal, the Kavas challenge two aspects of the district court's decision on the ordinary medical-malpractice claim. First, the Kavas claim that the district court erred in conflating Mrs. Kava's "ordinary malpractice claim with her lost opportunity claim . . . decid[ing] the latter claim while purportedly addressing the former claim." After noting that Dr. Kriegshauser "repeatedly testified that he could not opine that, more likely than not, Plaintiff could have avoided shoulder replacement surgery in the absence of Defendant's negligence," the district court further noted that "neither of Plaintiff's experts asserted that Defendant's negligence caused a loss of opportunity to avoid shoulder replacement surgery." *Kava*, 2009 WL 2948490 at *5. Second, the Kavas argue that the district court improperly restricted Mrs. Kava's medical malpractice claim to the "ultimate result of 'shoulder replacement,'" failing to consider separate harms flowing from

11

Dr. Peters's alleged negligence, "including substantial pain and suffering to Mrs. Kava." The Kavas argue that "MCL 600.2912a(2) only requires that plaintiff suffer 'an injury' as the proximate result of defendant's negligence."

The Kavas' first contention is without merit. While the district court's disposition of Mrs. Kava's ordinary medical malpractice claim included some discussion of the issue of "loss of opportunity to avoid shoulder replacement surgery," the district court nevertheless evaluated Mrs. Kava's medical-malpractice claim independently from her loss-of-opportunity claim. Indeed, the district court emphasized that Plaintiffs' own expert "repeatedly testified" that he could not conclude that Mrs. Kava, more likely than not, could have avoided shoulder replacement surgery in the absence of Dr. Peters's alleged negligence. As the excerpted deposition testimony shows, Dr. Kriegshauser would not state that Mrs. Kava, more probably than not, could have avoided her partial shoulder replacement surgery if Dr. Peters had detected the infection during the initial consultation on October 19, 2005. He further testified that even if Dr. Peters had properly treated Mrs. Kava, she would have experienced "permanent morbidity" or "permanent problems" with her shoulder. Additionally, the contested affidavit filed by Dr. Harrison offers no medical opinion as to whether Dr. Peters's failure to diagnose the infection on October 19, 2005 proximately caused Mrs. Kava's shoulder replacement surgery. Thus, the court properly held that Plaintiffs had failed to offer evidence sufficient to raise a genuine issue of material fact concerning whether Dr. Peters proximately caused Plaintiff's injury. In so holding, the court properly applied the first sentence of Mich. Comp. Laws § 600.2912a(2), which places the burden on the plaintiff to prove "that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." The court included the "loss-of-opportunity" claim in its discussion

12

because it noted that the expert testimony provided a basis for summary judgment "with respect to *all* of Plaintiff's claimed damages arising out of her shoulder replacement surgery." *Kava*, 2009 WL 2948490 at *5.

Moreover, in the absence of any expert testimony or other facts in the record concerning independent harms flowing from Dr. Peters's negligence, the district court did not err in focusing its analysis on the "ultimate" result or injury of shoulder replacement surgery. On appeal, the Kavas point to no expert testimony or other facts in the record that would establish that Dr. Peters's negligence caused any other specific injury to Mrs. Kava. The district court found that there was "no evidence" that Dr. Peters's negligence was "the proximate cause of damage necessitating shoulder replacement surgery." *Id.* Thus, the Kavas' second contention is also without merit.

Because the Kavas do not present sufficient evidence to create a genuine issue of material fact regarding whether Dr. Peters proximately caused Mrs. Kava to suffer a physical injury, the district court did not err in granting summary judgment in Dr. Peters's favor on Mrs. Kava's traditional medical-malpractice claim.

### C. Mrs. Kava's Loss-Of-Opportunity Claim

The Kavas' second claim on appeal is that the district court erred in granting summary judgment for Dr. Peters on Mrs. Kava's alternative ground for relief–her loss-of-opportunity claim. Having found that Dr. Peters was entitled to summary judgment on Mrs. Kava's medical-malpractice claim, the district court turned to the question "whether Plaintiff's evidence supports a claim for any other damages." *Id.* The district court held that "[a]t best, Plaintiff's evidence indicates that Defendant's negligence prevented Plaintiff from obtaining, or caused Plaintiff to lose an opportunity to obtain, some undefined 'better outcome.'" *Id.* at *6. The court held that Dr. Peters was entitled

13

to summary judgment on this claim because "Plaintiff's evidence is too speculative because evidence of Plaintiff's inability or loss of opportunity to obtain a 'better outcome' provides no basis for a jury to award damages." *Id.* The district court quoted *Health Call of Detroit v. Atrium Home & Health Care Servs.*, 706 N.W.2d 843 (Mich. Ct. App. 2005), a state court of appeals decision that restates the general tort rule against recovery for remote, contingent or speculative damages. On appeal, the Kavas argue that the district court erred in applying "a 'damages' rule and not a 'malpractice' rule" which "expressly addresses uncertainty relative to the permissible *amount* of recoverable damages, and *not* relative to the available *form* of those damages." The Kavas argue that the district court improperly applied this general tort principle to their claim.

In *Ensink v. Mecosta Cnty. Gen. Hosp.*, 687 N.W.2d 143 (Mich. Ct. App. 2004), the court evaluated whether the trial court erred in granting summary disposition in favor of defendants on the basis that damages for plaintiff's loss-of-opportunity claim were speculative. *Id.* at 147. The court noted that the question of what damages might reasonably be anticipated is a question ordinarily left to the fact-finder. *Id.* at 148 (citing *Wendt v. Auto Owners Ins. Co.*, 401 N.W.2d 375 (Mich. Ct. App. 1986)). The court held that in the case before it, the trial court erred in granting summary disposition because

> plaintiff established damage. He was paralyzed by an ischemic stroke that was directly related to defendants' negligence, the failure to administer t-PA within three hours of the onset of the stroke. Accepting plaintiff's allegations as true for the purposes of reviewing the grant of summary disposition, plaintiff has therefore established the fact of damages stemming directly from defendants' negligence, and it is only the amount of damages that is in question. *Hofmann*, *supra* at 108, 535 N.W.2d 529. The damages are therefore neither remote nor contingent and the degree of imprecision is that with which juries routinely must contend.

*Id.* at 148.

In this case, by contrast, Mrs. Kava failed to establish damage "directly related" to Dr. Peters's negligence, and therefore the court properly granted summary judgment in favor of Dr. Peters on the basis that "Plaintiff's evidence is too speculative." As noted above, regardless of whether Plaintiffs are pursuing a traditional medical-malpractice or a lost-opportunity claim, they "must establish: '(1) the standard of care, (2) breach of that standard of care, (3) injury, and (4) proximate causation between the alleged breach and the injury.'" *Lanigan*, 766 N.W.2d at 900 (quoting *Pennington*, 719 N.W.2d 616). The purpose of a loss-of-opportunity claim is to remedy a plaintiff who "cannot prove that a defendant's actions were the cause of [her] injuries, but can prove that the defendant's actions deprived him of a chance to avoid those injuries." *Stone*, 753 N.W.2d at 110. A plaintiff raising this claim typically proffers evidence to show that as a result of defendant's negligence, she lost an opportunity to avoid a specific injury (such as death) or to obtain a specific better result, and suffered damages as a result of that loss of opportunity. *See, e.g.*, *Id.* at 108 (The plaintiff proffered expert testimony that the defendant's negligence caused a lost opportunity to avoid amputation of his legs and other injuries.); *Falcon*, 462 N.W.2d at 45 ( The plaintiff's proffered expert testimony showed that the defendant's negligence caused the decedent's loss of opportunity for survival.); *O'Neal*, 791 N.W. 2d at 868 (Markman, J., concurring) (The plaintiff's expert testimony showed that the defendant's negligence proximately caused the plaintiff a lost opportunity to avoid a stroke.); *Ensink*, 687 N.W.2d at 148 n.7 (The plaintiff's expert opined that plaintiff lost an opportunity for "some improvement" that included a possible 30 to 50 percent chance of a complete cure because the plaintiff was young, was not diabetic, and had a normal CT scan). A loss-of-opportunity "cause of action accrues when harm and damages result from the loss of a substantial opportunity for a better result." *Falcon*, 462 N.W.2d at 57, n.43.

15

In this case, the district court noted that in the course of litigating their claims, Plaintiffs "appear[ed] to be conflicted as to which type of claim they [were] pursuing." Specifically, the court took note of Plaintiffs' contradictory filings:

> In their response to the motion for summary judgment, Plaintiffs offer the testimony of their experts purporting to show that Defendant's negligence resulted in a loss of opportunity for a "better outcome." In response to one of Defendant's motions, Plaintiffs assert that they are not pursuing a lost opportunity claim; rather, they claim to seek damages for a physical injury caused by Defendant's negligence.

*Kava*, 2009 WL 2948490 at *4. Given Plaintiff's belated assertion of a claim for loss-of-opportunity, the evidence in support of this claim was scant. Dr. Krieghauser testified that if Dr. Peters had not breached his standard of care, Mrs. Kava, more likely than not, would have had the opportunity for a "better outcome":

> Q: I'm not asking for sure. More likely than not isn't it your opinion that had the infection been diagnosed on the first visit when there was just the joint narrowing that it is more likely than not that you would have had a better result?
>
> A: I guess the way you are asking it I think I could state it would be more likely than not she would have statistically had a better chance of having a better outcome because the way – the sooner we treat infections generally the better the result.

(Kriegshauser Dep. at 67-68.)

The Kavas also proffered the contested affidavit of Dr. Donnis Harrison ("Dr. Harrison"), a physician who treated Mrs. Kava's shoulder after Dr. Peters's examination. In his affidavit, Dr. Harrison stated:

> It is my professional medical opinion that the failure to diagnose the infection in Brenda Kava's shoulder on October 19, 2005 and the two weeks leading up to that time decreased Brenda Kava's opportunity for some better outcome by greater than 50 percentage points.

16

It is my professional medical opinion that had the infection present in Brenda Kava's shoulder on October 19, 2005 and for two weeks prior to that time been diagnosed on October 13, 2005, or at any time during the two weeks prior to that date, it is more likely than not that Brenda Kava would have achieved a better outcome."

(Harrison Aff. at ¶¶7-8.)[3]

Having considered the experts' statements, the court noted that

It is not at all clear what Plaintiffs' experts mean by a 'better outcome,' and Plaintiffs have not come forward with any explanation. Even at oral argument, Plaintiffs could not clarify what a 'better outcome' would mean for Plaintiff. To award Plaintiffs damages, a jury would have to *assume* that a 'better outcome' means less pain and suffering, greater mobility and use of her shoulder, fewer medical treatments, shorter recovery from surgery, or something else entirely.

*Kava*, 2009 WL 2948490 at * 6. Contrary to Plaintiffs' contentions, the foregoing reflects that the district court focused, not on Plaintiffs' failure to quantify damages, but rather on the form of the harm and Plaintiffs' failure to introduce evidence or testimony that would "clarify what a 'better outcome'" would have meant for Mrs. Kava under the circumstances. Once the court noted that Plaintiffs had failed to adequately define the harm, the court properly concluded that "Plaintiffs have not offered any evidence in support of causation or damages." *Id.* In light of Dr. Krieghauser's deposition testimony that, even without Dr. Peters's negligence, Mrs. Kava would have sustained permanent damage to her shoulder, and that she would have had to incur medical expenses for

---

[3] As noted above, the district court did not find it necessary to decide Dr. Peters's objections to this affidavit–that it was filed in an untimely manner and that Plaintiffs failed to disclose that Dr. Harrison would testify as an expert on causation–because the affidavit "does not materially add to Plaintiffs' evidence." *Kava*, 2009 WL 2948490 at *5, n.4. A reading of the affidavit confirms the district court's conclusion. Not only does the affidavit fail to define "better outcome" in light of the facts of the case, it also fails to limit its discussion to the relevant time period, discussing "the two weeks" prior to Dr. Peters's initial consultation with Mrs. Kava on October 19, 2005, even though Plaintiff had conceded that Dr. Peters was not liable for any injuries that took place prior to this date.

antibiotics, surgical treatment of the infection, a hospital stay, home nursing care, and physical therapy, it was incumbent upon Plaintiffs to do so.

On appeal, the Kavas do not clarify whether their loss-of-opportunity claim is based on Mrs. Kava's lost opportunity to avoid her partial shoulder replacement surgery or her lost opportunity to obtain some different "better result" regarding injuries she suffered from the staph infection. The record shows that both experts stop short of describing what a "better outcome" means in light of the injuries suffered by Mrs. Kava that were connected to Dr. Van Wagner's original negligence. On summary judgment, Dr. Peters put forth evidence that Mrs. Kava's damages claim against him were too speculative to support recovery for their claim. The Kavas then bore the burden of presenting some evidence to show that a genuine issue of material fact existed regarding whether Dr. Peters's negligence proximately caused her injuries and resulting damages. They failed to do so, and thus, the district court did not err in granting summary judgment in favor of Dr. Peters on Mrs. Kava's loss-of-opportunity claim.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

18